Bartley, O. J.
The only question for adjudication presented by the agreed statement of the parties in this cause, is whether the statute of this state of the 21st of March, 1851, “providing for a ■Jax upon banks and bank and other stocks the same as other' property is taxable by the laws of this state,” so far as the same authorizes the assessment of a tax upon the property of the Bank of Toledo, is repugnant to that clause of the tenth section of the first article of the constitution of the United States, which is in the following words, to wit: “No state shall pass any law impairing the obligations of a contract.” The constitution of Ohio, in force-when this law was enacted, contained substantially the same provision, declaring that the legislature should pass no “law impair *539 ing the validity of contracts.” So that, if the law be repugnant to-the constitution of the United States, it was likewise in conflict with the constitution of the state. The investigation of this question involves the following direct inquiries:
First. Whether the statute of this state of the 24th of February, 1845, entitled “ an act to incorporate the State Bank of Ohio and other banking companies,” (which is claimed to be the charter of the Bank of Toledo as well as that of numerous other banks in the State,) constitutes a contract between the State of Ohio on the one part, and the Bank of Toledo, or the stockholders of that bank, on the *other, within the purview and true intent of the above mentioned prohibitory clause of the constitution of the United States.
Secondly, whether the 60th section, above recited, relating to taxation, contains a material or essential stipulation in such contract, not subject to change or modification by the law-making power of the state, without the consent of the bank.
These inquiries, which distinctly and directly arise in this case, present questions of very great interest and importance. The question whether the charter of an incorporated bank is a contract within the operation of the Constitution of the United States has occupied the chief attention of the counsel on both sides, been argued at very great length both orally and upon paper, and submitted, with all the lights which extensive research could bring to our aid. The other causes argued and submitted with this case, involved also other questions; but this cause involves the single subject presented by the agreed statement of the parties. The Bank of Toledo claims exemption from taxation imposed by the law of 1851,on the alleged ground that its charter is a contract within the operation of the constitution ; and whether the charter of this bank be such contract or not, is the main question presented by the parties for our determination. And, although this case might, perhaps, be decided upon other ground, yet since this question, if decided against the plaintiff, would be decisive of the whole case, it would seem like sheer evasion on the part of the court to decline its determination on the pretence that it did not arise in the ease. Such is the nature and importance of the question, and the frequency of its occurrence, that a majority of the court feel no disposition to-■evade the responsibility of its determination ; but deem it a duty *540 ■to meet it fully, fairly and frankly, with the expression of an opin> ion formed on the most careful and mature consideration.
1. Does the statute of Ohio of the 24th of February, 1845, entitled “ An act to incorporate the State Bank of *Ohio and other banking companies,” constitute a contract within the operation of the above mentioned prohibitory clause of the constitution of the United States?
It is not claimed on the part of the plaintiff that the law of 1851 impairs the obligation or validity of any contract between the bank and any other person, for the performance of any act or in relation to property in the ordinary signification of that term. But it is claimed that the law of 1845, containing the charter of the ■company, is a contract between the State of Ohio on the one side, and either the Bank of Toledo or the corporators of the bank on the other; and that the obligation or validity of such contract is impaired by the law of 1851. It is not pretended that any right ■of private property, in its ordinary sense, or any contract relative thereto, has been interfered with; but it is claimed that the civil privileges of the company, conferred by its franchise, consisting of its rights to act and continue its existence in the capacity of a corporation, to issue its paper for circulation as a currency or money to be exempt from all taxation, except as specified in the sixtieth section of the law, etc., constitute the subject-matter of a contract, and are in fact property, the right to which has been violated or impaired. The complaint, therefore, is not that the private prop, ■erty of the corporation, or any contract relating thereto, has been invaded; but that its political rights or exclusive privileges have been impaired.
That the restrictive clause of the constitution of the United States, above mentioned, was designed to embrace contracts respecting private property, or some object of pecuniary value, capable of estimation in a court of justice—indeed, -any thing which in the ordinary sense constitutes the proper subject-matter of a contract, is not controverted. But whether it was designed to comprehend the political relations between the government and its citizens, the civil privileges and immunities of corporations, and to restrain the •state in the regulation of its civil institutions adopted for internal government, is the question here presented.
*A full examination of the general question, whether the charter of a private corporation be a contract, which is involved in *541 this inquiry, would seem to be requisite, to elucidate the true nature and present bearing of the subject under consideration.
It has been adjudged by the supreme court of the United States, that a state law which interfered with and changed the arrangement made by contract for the disposition of private property; and also at the same time interfered with the franchise of a private-corporation, was unconstitutional and void. Such is the effect of the decision in the case of The Dartmouth College v. Woodward, 4 Wheat. 518. The doctrine that the charter of a private corporation is a contract within the operation of the restrictive clause of the constitution of the United States, has taken its origin from this case, which, as a judicial authority, does not, in fact, sustain it, as-I shall have occasion hereafter to show; yet the doctrine has been recognized and approved by the courts of a number of the states, including the supreme court of Ohio. And it is not to be denied that it has the sanction of authority entitled to great weight and very high consideration. But it is equally undeniable that; this doctrine has been recognized by courts, and promulgated by elementary writers, in very general terms, and without a distinct and definite view to the real and authoritative effect of the decision of the supreme court of the United States, upon which it was-founded, until it has become, to some extent, a subterfuge for fraud and a means of shielding corporations from responsibility and correction for the abuse of their corporate franchises.
The reason upon which this doctrine has been based has not. been universally satisfactory; and the evil consequences to the-community, of its general and loose application, in protecting corporations from responsibility for abuse, have made it so frequently a subject of controversy, that, notwithstanding the respect entertained for the authority by which it appears to have been sanctioned, it can not be ^claimed in fact to be unquestioned law. Mere precedent alone is not sufficient to establish and settle forever a legal principle. Infallibility is to be conceded to no human tribunal. A legal principle, to be well settled, must be founded upon sound reason, and tend to the purpose of justice. The mere-authority of no judicial opinion can place it beyond the reach of inquiry into its reason or its justice. We are taught by an author-illustrious for his profound knowledge of the common law, that law is the perfection of reason, and that it is the reason and justice-of a legal principle which give to it its validty. True it is, there- *542 are instances where the maxim Communis errorfacitjus, maybe applicable; but it is not applicable to a doctrine founded upon a fiction •or a fallacy, and which, in its consequences, is subversive of the great ends and purposes of justice. Chancellor Kent, in his Commentaries, vol. 1, page 477, says “ That there are more than one thousand cases to be pointed out in the English and American books of reports, which have been overruled, doubted, or limited in their application. It is probable that the records of many of the courts in this country are replete with hasty and crude decisions; and such cases ought to be examined without fear, and revised without reluctance, rather than to have the character of our laws impaired, and the beauty and harmony of the system destroyed by the perpetuity of error. Even a series of decisions are not always evidence of what the law is.”
I would not be understood as repudiating the aid of precedents, which are properly regarded as the great storehouse of experience, not always tobe followed, but tó be viewed as beacon lights in the progress of judicial investigation, which, if they do not prove deceptive and conduct us to the paths of error, may light our footsteps in the road to truth. Lessons of wisdom are to be extracted from the errors as well as the rightful judgments of mankind; while the one admonishes and warns, the other stands forth for imitation and adoption. Had precedent alone been consulted and followed, the great reforms in the progress of mankind would *never have been adopted. ■Governments were formerly regarded and conducted chiefly for the aggrandizement of those who possessed and controled the arm of civil power. Sovereignty was supposed to originate with and emanate from the successful leader, who acquired and held it by force under a claim of hereditary title; and the civil government was managed for the benefit of rulers rather than ruled. But our institutions have been constructed upon an entirely different basis. The supreme civil power is here recognized as originating from, and resting in the people, and government regarded as an institution whose sole object is the benefit of the governed. Absolute power is delegated to none ; and those who are authorized to administer any function of' civil power are but agents entrusted with delegated authority to be exercised only for the benefit of those who confer it. Here .all civil authority delegated by the people or conferred by the gov•ernment is a trust, which, in its nature, must be at all times subservient to the public good. And no individual ownership or pro *543 prietary interest can be created in a grant of civil authority. Tho principles of our political system, in some of the details of the public affairs, have been of gradual development; if we follow closely the examples and doctrines of other times and other systems, in determining the nature and extent of the powers distributed and •adjusted among the institutions of our own system, we1 shall be very certain to err, and to be led often to conclusions inconsistent with the true aim and object of our own system of government. A very numerous class of precedents, therefore, are useful in disclosing rather what we should avoid, than what we should follow. In the determination of a great question like that under consideration, recurrence should be had to fundamental principles, and the authority of precedent regarded so far only as there is to be found a conformity to reason, and the true nature of our own government.
The distinction between the rights of private property and the political rights, privileges, and immunities conferred or authorized by •law, from motives of public policy, is ^deeply marked and founded in the nature of the subject-matter to which they respectively pertain. The right of private property is an original and fundamental right existing anterior to the formation of the government itself; the civil rights, privileges and immunities authorized by law, are derivative—mere incidents to the political institutions of the •country, conferred with a view to the public welfare, and therefore trusts of civil power to be exercised for the public benefit. The theory of our government is founded upon the doctrine that all men are born equal, and this principle of equality of political rights lies at the foundation of all our civil institutions. The creation of vested rights, therefore, in the nature of private property, in the special authority and exclusive privileges and exemptions conferred by law upon a few, would bo destructive of this fundamental principle of our government. The primary object of the social compact is to protect man in his pursuit of happiness by maintaining this equality of political rights. Government is the necessary burden imposed on man as the only means of securing the protection of his rights. And this protection—the primary and only legitimate purpose of civil government—is accomplished by protecting man in his rights of personal security, personal liberty, and private property. The right of private property being, therefore, an original right, which it was one of the primary and most sacred objects of government to secure and protect, is widely and essentially dis *544 tinguished in its nature, from those exclusive political rights and special privileges and immunities which are created by law and conferred upon a few from motives of public policy in the administration of the government. The fundamental principles set forth in the hill of rights in our constitution, declaring the inviolability of private property, and prohibiting the enactment of any law impairing the obligations of contracts, were evidently designed to protect the right of private property as one of the primary and original objects of civil society, without any reference to the derivative ^rights or exclusive privileges and immunities which might be acquired by a few persons from the political institutions of the government. Independent of the restraints imposed by the declaration of these fundamental principles, the enactment of a law invading the right of private property, or impairing the obligation of a contract, would be a violation of one of the great primary objects for which the government itself was instituted, a usurpation of political power; and the law might well be declared to be void without any express constitutional provision to that effect. Smith’s Com. on Constitutional and Statutory Construction, 270. Taylor v. Porter, 4 Hill, 146 ; Varick v. Smith, 5 Paige, 159; Bowman v. Middleton, Bay, 252.
Much has been said about the omnipotence of parliament in England, where there exists no written constitution; but it is admitted and well understood that the omnipotence of parliament signifies nothing more than that parliament is supreme in the exercise of the legislative power of the government, and in that, uncontrolled by any superior. And it is not pretended in that body that its powers of legislation are unlimited in their exercise by the-great and fundamental principles of the social compact. "We learn from an early period in the parliamentary history of Great Britain,, that measures were opposed and defeated in that body, because of a tendency to violate the fundamental and primary objects of government itself, and, therefore, not within the scope of its authority. So that the doctrine that the power of parliament is omnipotent may be considered as resting in theory only. Pari. Hist., 33, 315; 9 Gill and Johns. 409. Some of the most eminent judges of England have never hesitated to declare an act of parliament void, which was against common right and natural justice, or in violation of those original and fundamental rights for the security of which government was instituted. Bracton L. 4, 228; Dr. Bonham’s case, *545 8 co. 234, per Coke, C. J.; London v. Wood, 8 Mod. 687, 688, per Holt, C. J.; Day v. Savage, *Hobart, 87, per Hobart, C. J.; The Regents of the University of Md. v. Williams, 9 Gill & Johns. 408, 409, per Buchanan, C. J. Yet, notwithstanding all this, the-right of parliament to repeal, modify, and regulate the charters of private corporations has been acknowledged upon all hands, often, exercised, and always sustained.
The attempt was made and defeated in the- British Parliament,, to maintain the special and exclusive rights,' privileges, and immunities of a private corporation upon the same ground with the-rights of private property secured by magna charta. When, in 1783, a bill was introduced into parliament by Mr. Fox, for the-purpose of repealing the charter of the East India Company, a charter purchased by the payment of a large bonus, and stamped by repeated acts with the faith of the government, the primary objection made by those who opposed it was “ that the bill was an attack upon the chartered rights of men.” This objection was met-by Mr. Burke, the most learned and profound statesman of his age, with a force and power of argument rarely if ever surpassed by any other argumentative effort. From the speech of Mr. Burke on that occasion, the following extract is in point and appropriate :
“As to the first of these objections, I must observe that the phrase-of ‘the chartered rights of men,’ is full of affectation, and very unusual in the discussion of privileges conferred by charters of the present description. But it is not difficult to discover what end that ambiguous mode of expression so often reiterated is meant to answer.
“ The rights of men, that is to say, the natural rights of mankind, are indeed sacred things; and if any pnblic measure is proved mischievously to affect them, the ocject ought to be fatal to that measure, even if no charter at all could be set np against it, If these natural rights are further affirmed and declared by express-covenants—if they are clearly defined and secured against chicane —against power and authority, by written instruments and positive engagements, they are in a still better condition; they partake not-only of the sanctity of the object so secured, but of that solemn public faith itself, which secures an object of such importance,. Indeed, this formal recognition by the sovereign power of an original right in the subject, can never be subverted, but by rooting up *546 ■the holding radical principles of government, and even of society itself. The charters which we call by distinction great, are public instruments of this nature—I mean the charters of King John and King Henry the Third. The *things secured by these instruments may, without any deceitful ambiguity,, be very fitly called the chartered, rights of men.
“ These charters have .made the very name of a charter dear to the heart of every Englishman. But, sir, there may be, and are, charters not only different in nature, but formed on principles the very reverse of the great charter. Of this kind is the charter of the East India company. Magna charta is a charter to restrain power and to destroy monopoly. The East India charter is a charter to establish monopoly and to create power. Political power and commercial monopoly are not the rights of men, and the rights of them derived from charters it is fallacious and sophistical to call the chartered rights of men. These chartered rights (to speak of such charters and of their effects in terms of the greatest possible moderation) do at least suspend the natural rights of mankind at large, and in their very frame and constitution are liable to fall into direct violation of them.
“But having stated to you of what description the chartered rights are which this bill touches, I feel no difficulty at all in acknowledging the existence of those chartered rights in their fullest extent. They belong to the company in the surest manner, and they are secured to that body by every sort of public sanction. They are stamped by the faith of the parliament; they have been bought for money, for money honestly and fairly paid; they have been bought for a valuable consideration over and over again.
“Those who carry the rights and claims of the company the furthest, do not contend for more than this; and all this I freely grant. But granting all this, they must grant to me in my turn that all political power which is set over men, and that all privileges claimed or exercised in exclusion of them, being wholly artificial, and for so much a derogation from the natural equality of mankind at large, ought to be some way or other exercised ultimately for their benefit.
“If this is true with regard to every species of political dominion and every description of commercial privilege, none of which can be original self-derived rights, or grants for the mere private benefit of the holders, then such rights or privileges, or whatever *547 else you choose to call them, are all in the strictest sense a trust, and it is of the very essence of every trust to be rendered accountable, and even totally to cease, when it substantially varies from the purposes for which alone it could have a lawful existence. This, I conceive, sir, to be true of trusts of power vested in the highest hands, and of such as seem to hold of no human creature. But about the application of this principle to subordinate derivative trusts, I do not see how a controversy can be maintained. To whom then would I make the East India company accountable ? Why, to parliament, to be sure; to parliament, from whom their trust was derived; to parliament, which alone is capable of comprehending the magnitude of its object and its abuse, and alone capable of an effectual legislative remedy.”
The true nature of the franchise of a private corporation is here portrayed in clear and comprehensive language. We are here told that it is an institution to establish monopoly *and to create power; that to speak of such charters and their effects in terms of the greatest possible moderation, they do at least suspend the natural rights of mankind at large, and in their very frame and constitution are liable to fall into a direct violation of them ; that all special privileges of this kind, claimed or exercised in exclusion of the greater part of the community, being wholly artificial, and for so much a derogation from the natural equality of mankind at large, ought to be some way or other exercised ultimately for their benefit; and that they are not original self-derived rights, or grants for the mere and sole private benefit of the holders, but rights and privileges, which in the strictest sense are derivative trusts, and from their very nature accountable to the power which created them.
The question under consideration being a question of constitutional and statutory construction, must be determined by the application of those well settled and well known rules of interpretation, by which the true intent and legal effect of an instrument are ascertained.
If there be anything well settled in the law relating to corporations, it is that their charters, being grants of power or authority in derogation of the natural rights and equality of men, must be construed favorable to the public, and strictly as against the corporation, in whose favor nothing can be claimed by implication. The Proprietors of the Stourbridge Canal v. Wheeling, 2 B. & Ad. *548 793; 4 Cruise’s Dig. 567; United States v. Arredondo, 6 Pet. 738; Perrine v. The Chesapeake and Delaware Canal Co., 9 How. 172; The Cincinnati College v. The State, 19 Ohio, 110. In the case of the Charles River Bridge v. Warren Bridge et al., Chief Justice Taney, in delivering the opinion of the court, said that, “The continued existence of a government would be of no great value, if by implications and presumptions it was disarmed of the powers necessary to accomplish the ends of its creation, and the functions it. was designed to perform transferred to the hands of privileged corporations.”
*It is a rule of interpretation, of universal application, that a law is to be so construed as to carry out the intention of the maker, and that to ascertain that intention, not merely is the language of the law to be looked to, but also the subject-matter to which it relates, the evil provided against, and the attending circumstances and understanding at the time the law was framed.
In addition to the aid. of these rules of construction and interpretation, in ascertaining the true meaning of the restrictive clause of the constitution of the United States, which declares that no state shall pass any “ law impairing the obligations of contracts the following expressive language of Chief Justice Marshall, in delivering the opinion of the court, in the case of Dartmouth College v. Woodward, 4 Wheat. 627, will tend to the elucidation of the subject.
“It has been argued that the word ‘contract,’ in its broadest, sense, would comprehend the political relations between the government and its citizens; would extend to offices held within a state for state purposes, and to many of those laws concerning civil institutions, which must change with circumstances, and be modified by ordinary legislation ; which deeply concern the public, and which, to preserve good government, the public judgment must, control. That even marriage is a contract, and its obligations are affected by the laws respecting divorces. That the clause in tbm constitution, if construed in its greatest latitude, would prohibit these laws. Taken in its broad unlimited sense, the clause would be an unprofitable and vexatious interference with the internal concerns of a state, would unnecessarily and unwisely embarrass its legislation, and render immutable those civil institutions, which are established for purposes of internal government, and which, to sub-serve those purposes, ought to varywith varying circumstances *549 That, as the framers of the constitution could never have intended to insert in that instrument a provision so unnecessary, so mischievous, and so repugnant to its general spirit, the term 1 contract ’ must be understood in a more limited sense. That it must be understood as intended to guard against a power of at least doubted utility, the abuse of which had been extensively felt; and to restrain the legislature in future from violating the right to property. That anterior to the formation of the constitution, a course of legislation had prevailed in many, if not in all of the states, which weakened the confidence of man in man, and embarrassed all transactions between individuals, by dispensing with a faithful performance of engagements. To correct this mischief by restraining the power which produced it, the state legislatures were forbidden ‘ to pass any law impairing the obligation of contracts,’ that is, of contracts respecting property, under which some individual could claim .a right to something beneficial to himself; *and that since the clause in the constitution must, in construction, receive some limitation, it may be confined, and ought to be confined, to cases of this description; to cases within the mischief it was intended to remedy.
“ The general correctness of these observations can not be controverted. That the framers of the constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government, and that the- instrument they have given us is not to be so construed, may be admitted. The provision of the constitution never has been understood to embrace ■other contracts than those which respect property, or some object •of value, and confer rights which may be asserted in a court of justice.”
Again, Chief Justice Marshall adds, in reference to the rights claimed in behalf of the corporation (see page 644 of same opinion):
“ It is more than possible that the preservation of rights of this ■description was not particularly in the view of the framers of the constitution when the clause under consideration was introduced into that instrument. It is probable that interferences of more frequent occurrence, to which the temptation was stronger, and of which the mischief was more extensive, constituted the great motive for imposing this restriction on the state legislatures.”
This lucid exposition of the constitutional provision in question establishes the following positions:
*550 1. That the term “ contract" as used, in this clause of the constitution, is not to be taken in its broad and most comprehensive sense, but on the contrary, must be understood in its more limited signification, and as embracing no other contracts than those of the ordinary kind, respecting property or some right which is an object of value, capable of being asserted in a court of justice, and of the nature of the right of property.
2. That the term “ contract,” as used, does not comprehend the political relations between the government and its citizens, does not extend to the laws concerning the civil institutions of the states, established for the purposes of internal government, and which, to subserve those purposes, must change with circumstances and be modified by ordinary legislation; and that the framers of the constitution did not intend by this provision to restrain the states in the regulation of their civil institutions.
3. That the evil intended to be provided against, by this constitutional restraint, was a course of legislation which had *prevailed in many, if not in all. of the states, anterior to the formation of the constitution which had weakened the confidence of man in man, and embarrassed all transactions between individuals by dispensing with a faithful performance of contracts of the ordinary character; and that, at the time of the formation of the constitution-, the term contract, in its ordinary sense, was not understood to comprehend the laws of the states, adopted from motives of public policy, creating private corporations.
We have here, in clear and explicit language, the sense in which, the framers of the constitution employed the term “ contract," in this provision, the circumstances under which it was inserted in the-constitution, the mischief designed to be guarded- against, and the opinion of the supreme court of the United States, by Chief Justice Marshall, that.the provision was never intended by the framers of the constitution to extend to grants of civil authority, or to restrict the legislation of the states in regard to their civil institutions adopted for internal government. It is fair to conclude that if the framers of the constitution had intended this restraint to.extend to the civil institutions of the states, and grants of civil authority, that language would have been employed, which, in its ordinary signification, would have been clearly understood to express it. In order to extend this constitutional provision so as to include the charters of corporations, it is necessary, in the first. *551 place, to adopt the fiction that á law creating a private corporation is a contract; and in the second place, by implication, to attach to the law, as such contract, the condition that it is not to be subject to repeal or alteration at the discretion of the legislature ; and in the third place, to enlarge and extend the meaning of this constitutional restraint, by a latitudinous construction, against the clear intention of the framers of the constitution ; and all this in violation of that well known rule of construction, that whatever relates to grants of civil authority, in derogation of the natural rights or equality of man, is to be strictly construed.
*The question touching the validity of the law of 1851 arising under the constitution of the United States, is not whether the law divests antecedent vested rights of property, but whether it impairs the obligations of a contract. Chief Justice Taney, in the case of Charles River Bridge v. Warren Bridge, 11 Pet. 539, says :
“ It is very clear that in the form in which this case comes before us, being a writ of error to the state court, the plaintiffs, in claiming under cither of these rights, must place themselves on the ground of contracts, and can not support themselves upon the principle that the law divests vested rights. It is well settled by the decisions of this court that state law may be restrospective in its character, and may divest vested rights and yet not violate the constitution of the United States, unless it also impairs the obligations of a contract. In Satterlee v. Mathewson, 2 Pet. 413, this court, in speaking of the state law then before them, and interpreting the article in the constitution of the United States which forbids the states to pass laws impairing the obligations of contracts, uses the following language: ‘ It (the state law) is said to be retrospective ; be it so. But retrospective laws that do not impair the obligation of contracts, or partake of the character of ex post facto laws, are not condemned or forbidden by any part of that instrument,’ (the constitution of the United States); and in another passage in the same case the court say : 1 The objection, however, most pressed upon the court and relied upon by counsel for the plaintiff in error was that the effect of this act was to divest rights which were vested by the law in Satterlee. There is certainly no part of the constitution of the United States which applies to a state law of this description; nor a*e we aware of any decision of this, or any circuit court which has condemned such a law upon this ground provided its effect be not to impair the obligation of a Contract.’ *552 The same principles were reaffirmed in this court in the last case of Watson and others against Mercer, decided in 1834, 8 Pret. 110: ‘ as to the first point (say the court) it is clear that this court has no right to pronounce an act of the state legislature void, as contrary to the constitution of the United Stales, from the mere fact that it divests antecedent vested rights of property. The constitution of the United States does not prohibit the states from passing xestrospective laws generally, but only ex post facto laws, which relate only to penal and criminal proceedings, and not to civil proceedings which effect private rights restrospectively.”
The general principle that one legislature is competent to repeal or modify any act which a former legislature was competent to pass, and that one legislature can not abridge the powers of a succeeding legislature, is distinctly sanctioned as to all general legislation by the supreme court of the United States in Fletcher v. Peck, 6 Cranch, 87. But it is said that where absolute rights of property have been «acquired and vested by conveyances of the title to, or delivery of the possession of property, under the authority of a law, or where contracts have been made under and in pursuance of the authority of a law, and rights thereby vested, the simple repeal of the law does not divest the rights thus vested. This may be correct as to rights acquired from conveyances or contracts under the law, and pursuant to its authority; but it can not bo applicable to rights conferred by the law in and of itself, which are inherent in its terms and can continue only as incidents to the law itself. When property is transferred by conveyance or delivery of possession under the authority of a law,the vested right attaches as an incident to the property, and adheres to and passes with it. Bo, also, where a contract is made under the authority of a law, the right of property acquired arises not from the law itself but from the contract to which it pertains as an incident. And, in either case, the prospective repeal of the law could not divest the rights thus acquired, originating not in the law itself but in acts done under the law, and which attach as incidents not to the law, but to the property conveyed or contract made under the law. But the franchise of a corporation which consists, not of the rights of property acquired by conveyances, contracts or investments under the authority of the charter, but of the civil rights, privileges and immunities conferred by the law itself and inherent-in its terms, is essentially an incident of the law itself, dependent'upon the continuance *553 ■of the law, and extinguished by its repeal. For this reason it.is claimed that the charter of a private corporation is a contract, which from its nature implies a surrender of the legislative power of amendment or repeal. This implied relinquishment of a part of the legislative power of the state, is claimed on the ground of the ■ character of the corporation created, which is alleged to be a mere matter of private interest, unconnected with the administration of the public affairs, and therefore not liable to be made subservient to the public welfare by legislative control.
*A corporation is a civil institution. It is established by a
.law of the state from considerations of public policy. Its existence, its capacities, and its powers are all conferred by law from some real or supposed public benefit to result from it. If this mere creature of the law thus instituted or established, be not a political institution of the state, it would be difficult to conceive under what other denomination it could be placed by any sensible distinction which could be invented. Mr. Kyd, a reputable elementary author, has furnished the following comprehensive and descriptive definition : “ A corporation, or body politic, or body incorporate, is a collection of many individuals united in one body, under a special denomination, having perpetual succession under an artificial form, and vested by the policy of the law with a capacity of acting, in several respects, as an individual, particularly of taking and granting property, contracting obligations, and of suing and being sued; of enjoying privileges and immunities in common, and of exercising a variety of political rights, more or less extensive, according to the ■design of its institution, or the powers conferred upon it, either at the time of its creation or at any subsequent period of its existence.’" Kyd on Corp. 13. In England, a corporation is usually created by .a charter granted by the King, but sometimes by an act of Parliament. But the supreme court of the United States say, in Bank of Augusta v. Earle, 13 Pot. 519, “ In this country, no franchise can be held which is not derived from the law of the state.” In the latest edition of Angelí & Ames on Corp. pp. 3 and 4, the authors ■say: “The words incorporation and corporation are frequently confounded, particularly in the old books. The distinction between them is, however, obvious; the one is a political institution; the •other only the act by which that institution is created. When a corporation is said to be a person, it is understood to be so only in certain respects and for certain purposes, for it is strictly a political institu *554 t-ion.” It matters not that private or individual interests maybe invested in tbe corporation, or under the authority of the charter, so far1 *as this denomination of the institution is concerned. Individual interests or investments in private property exist under a great variety of the civil institutions of the state. Private institutions are those which are created or established by private individuals for their own private purposes. Public institutions are those which are created • and exist by law or public authority. Some public benefits or rights may result from the institutions of private individuals or associations. So also some private or individual rights may arise from public institutions. The only sensible distinction between public and private institutions is to be-found in the authority by which, and the purpose for which, they are created and exist. Because, therefore, a corporation may fall under the denomination of private corporations, in the artificial-distinction between public and private corporations, it is none the less a public or political institution. The distinction between public and private corporations is somewhat arbitrary, and by no means determines whether the corporation is a public or private institution. If the stock in a banking, railroad, or insurance corporation be exclusively owned by the government, the institution is denominated a public corporation ; but if a private indvidual be-allowed to own a single share of the stock, in common with the government, it is said that it becomes a private corporation. Eleemosynary corporations, established for the purpose of public charity or for the advancement of religion, education, or literature, upon donations or bequests made exclusively for these great and beneficial public purposes, without the right to or expectation of dividends, repayment or other individual or private interest therein in future, are denominated private corporations. But an incorporated village, in the use or expenditure of whose property the-citizens of the village have individual and private interests, and receive daily individual and private benefits, is denominated a public corporation. To say that an incorporated bank, authorized and created from considerations of public policy, and endowed by law with the extraordinary power and sovereign attribute of creating in *fact the circulating medium of the countiy, and regulating the standard of value, is not a public institution of the state adopted for the purposes of internal government, because it falls under the artificial denomination of private corporations, *555 would be arrogant absurdity. And it would be equally as absurd to treat a railroad corporation as a private institution, which is endowed with extensive powers, and the extraordinary sovereign authority of exercising the right of eminent domain by taking private property for public purposes. In truth and in reality, whatever arbitrary or fictitious distinctions may have been created by mere verbiage, these corporations are in fact public institutions, created by public authority, from considerations of public policy, and endowed with highly important civil power for the advancement of the public welfare. It would be unreasonable at least (tO' speak with the greatest moderation), to say that because some private interests are invested in these corporations, that, therefore, they must be denominated private institutions, and for that reason placed beyond the reach of responsibility to the law-making power of the state by which they were created. The most sacred rights of private property are made subservient to the public welfare. Under the right of eminent domain, the land which a man has purchased with the fruits of his own labor, even the very spot upon which he has erected his domicil, hallowed by all the associations of home, and to which he holds a title in fee simple evidenced by a patent from the government, may be taken from him, and that too-by a corporation, on the ground of subserving the public interests. Shall this be done, and yet the individual interests of the stockholders in this very corporation be placed above and beyond all subserviency to the public welfare, from the paltry consideration, that, although in fact and in reality a public institution, the corporation is technically denomination & private corporation ? To show the utter fallacy of this distinction, the East India company, which held and exercised the right, under a charter from G-reat Britain, to exclude their fellow subjects from the commerce of half the *globe, to administer an annual revenue of seven millions sterling, to command an army of sixty thousand men, and to dispose of the lives and fortunes of thirty milliions of their fellow-creatures, came under this denomination of private corporations 1
It is admitted upon all hands that the legislature has control over those corporations which are denominated public corporations, either to modify or to repeal their charters, as will best subserve the public interests. But it is claimed that the charters of those corporations, technically denominated private corporations, must be regarded as contracts, and, therefore, beyond the control and regu *556 lation of the law-making power of the state. And this, according to a late elementary work, is “ the main distinction between public and private corporations.” See Angelí and Ames on Corp. 27, 28. This distinction is not founded on sound reason, but is based upon a fiction, and has its origin in that short-sighted timidity of capitalists, which distrusts the integrity and stability of the government. The true reason which has given rise to this constructive fiction, is to be found in the following remarks of Angelí and Ames on Corp. 730, to wit: “ Corporate property and franchises, important- as they usually are in amount and extent, and undefended by the same strong sympathies which guard individual rights, offer a more tempting and easier spoil to misguided power, whether' it reside in the prince or the people.” It is this distrust ■of the government which has given rise to the doctrine that a charter is a contract; and the whole doctrine of vested rights, which has for its object the establishment of the- rights and property of corporations upon a footing of far greater sanctity and permanency than the rights and property of private persons, by placing them beyond the reach of the law-making power of the state. It is a humilating reflection to the friends of our republican institutions, that the efforts to place the rights and'property of corporations upon a footing of greater sanctity than those of private persons have been resisted with far greater success in England than they *have been in this country. The right of parliament to amend or repeal the charters of private coi*porations has for many years been undisputed. A late elegant and critical historian, in his work of standard authority (see Hallam’s Constitutional History of England, 101, 102), places the exercise of the power of the legislative authority to re-mould and regulate the rights and property of corporations upon far slighter grounds and reasons of convenience and public interest, than the rights and property of private persons. The doctrine of vested rights, advocated in this country, which places the adventitious rights resulting from this favored class of our political institutions upon ground of higher regard and sanctity than the fundamental rights of private property in the individual citizen, is truly startling when understood in all its bearings, and has its origin in a groundless and over-reaching timidity. The example of England presents us with no instances of the violation of corporate property and franchises, by the flagrant acts of “ misguided power.” Upon this subject, tho *557 following remarks of the late venerable chief justice of this state-in our late constitutional convention, as the result of much observation and experience, are not inappropriate:
“Mr. Hitchcock, of Geauga, had said hitherto, and said still, that he saw no objection to giving the general assembly the power to repeal all acts of incorporation. The only consideration was the question of policy, as to the manner in which it should be exercised. Now, the general assembly always had the power to retain the right of repeal of each act of incorporation, and, in his opinion, it should have exercised it in nearly every instance, except in corporations for internal improvements.” See Debates and Proceedings of the late Constitutional Convention of Ohio, vol. 2, 619.
Upon this subject we have an example before us more triumphantly convincing than any argument or authority. In the State of New York, since the year 1828, out of abundant caution, and to protect the state and people from this pernicious doctrine of vested right, in regard to ^corporations, which the courts appeared disposed to adopt, the charter of every corporation which has been granted, has been by express statutory provision subjected to alteration, suspension, or repeal, in the discretion of the legislature. And in 1846 the same provision substantially was inserted in the constitution of that state; yet, notwithstanding this fact, it has-scarcely escaped the observation of any one that banking, railroad, and other corporations have grown up and existed undisturbed, and internal improvements, commerce, and enterprise generally,, flourished in New York to an extent unexampled even in any other state of the Union.
Whether regard be had to the franchise of the corporation alone or to the investments of private property under the authority of the charter, in either instance there exists no good reason for the distinction above mentioned between public and private corporations. The elements of a contract in the grant of the franchise exists in the one case, if it does in the other; and the rights of private property would be invaded or violated by a repeal of the charter in one instance, if they would be in the other. Take, for1 example, an incorporated village, an incorporated bank, and an incorporated college or church, all but the first of which being-denominated private corporations, and let a comparison be made. The citizens of the village apply for a charter. It is granted to them. The franchise confers special privileges, beneficial to the; *558 whole village and each individual citizen of it. The citizens of the village accept the charter, and organize the corporation, and on the faith of the continuance of the charter, the corporate body, by taxation and otherwise, becomes possessed of a valuable property, both real and personal, to be held and used by the corporation for the benefit of the citizens of the village. Where are the ■constituents or elements of a contract in the case of the bank or the college, or church, which do not exist here? In the case •of the bank, the corporators may have a more immediate individual interest in the property of the bank than the citizens of the village in the property of their corporation; but this can not create the distinction, *for such is not the caso with the college or the church. The corporation officers and citizens of the village have at least as direct and immediate an interest in the property and business of their corporation as the trustees and members of the church, or the trustees or patrons of the college; and the citizens of the village, in fact, receive a more direct personal and pecuniary advantage from the franchise of their corporation than do the corporators of the college, or the trustees and members of the church, from the franchise.
Again, suppose a repeal of the charter of each one of these corporations. If the obligation of any contract be thereby impaired, or the rights of private property violated, in the one case, the same occurs in the case of each of the others. The franchise conferring special privileges, and civil power and authority in each case, is taken away, and the future benefits or advantages thereof lost by the persons directly or indirectly interested therein. The village ■corporation may be supposed to own extensive and valuable property acquired from taxes imposed upon the citizens of the village .and otherwise, consisting of real estate with valuable buildings thereon, fire engines, water works, stocks, choses in action, and ■other property acquired and held for the benefit of the citizens of the village; also, private individuals may have acquired important rights of property by contracts or obligations against the corporation, or by leases of buildings, water privileges, market places, licenses, etc. The unconditional repeal of the village charter strips that corporation of its franchise, and extinguishes all its civil authority, and indeed the corporate existence itself. This franchise, •or the civil authority and special privileges conferred by it, may have been highly beneficial and of great- value to the citizens of *559 -the village. In case of a private corporation, it is this franchise or the authority and privileges conferred by it, which is said to constitute the subject-matter of the contract with the state, which is impaired by the repeal or amendment of the charter. If the franchise, or the civil authority and special privileges conferred by it, ■constitute the subject of a contract «in the latter case, I can conceive no good reason why it does not in case of the village. In both instances, a corporate franchise is granted by the state, and accepted by the corporators. In both instances, civil power and authority, and special privileges, beneficial to the corporators, are conferred. And in both instances, investments in private property are made under the authority of the charter, and on the faith of its continuance.
The investments in private property, made under the authority •of the charter, arise, not from the alleged contract between the ■corporation and the state, of which the corporate franchise is said to be the subject-matter, but from contracts between the corporation and other persons. The stock in a bank or railroad corporation is held by a contract between the corporation and the stockholder. Contracts are daily made with corporations, and almost daily investments are made in private property,'under the authority of their charters; but it is not claimed that the state is a party to any of these transactions. The complaint is not that either the contracts by which investments are made in the stock of the corporation, or the contracts by which the corporation acquires and holds private property, or the contracts out of which arise the liabilities of the corporation to other persons, are impaired by the alteration or repeal of the charter. It is the charter or franchise of the corporation, which is said to constitute the contract with the state, within the operation of the restrictive clause of the constitution. It does not necessarily follow, as a consequence of the repeal ■of the charter of a corporation, that the rights of property in the capital stock or the undivided profits, or other property acquired and held under the authority of the charter, will be impaired or lost to those beneficially interested therein. The corporation itself, as an artificial person in the management of the corporate property and business, acts, in fact, only as a trustee for the individual corporators and those interested. “The great object of an incorporation,” says Chief Justice Marshall, “ is to bestow the character and properties of individuality on a «collective and chang *560 ing body of men.” Providence Bank v. Billings et ail., 4 Pet. 561. True it is, that, by the common law, on the dissolution of a corporation, its real estate reverts to the grantor and his heirs; its-personal estate vests in the state; and the debts due to and from it are wholly extinguished. But the common law, in this particular, is modified by statute, so that such can not be claimed as the necessary consequence of the exercise of the right of repeal. Even, by special provision in the act repealing the "charter of a corporation, all the rights of property originating under the authority of the charter can be protected and saved for those beneficially interested. The corporation may be allowed to retain its corporate-powers, so far as may be necessary to enable it to settle and close up its affairs, and distribute its stock or property to those interested or equitably entitled to it; or the same object may be accomplished through the intervention of trustees oí1 assignees duly authorized and appointed for that purpose. 2 Kent Com. 247 ; Campbell et al. v. The Mississippi Bank, 6 How. (Miss.), 674; Nashville Bank v. Petway, 3 Humph. (Tenn.), 522 ; James v. Woodruff, 10 Paige, 541.
But in case of the repeal of the charter of a village corporation,, the difficulty in protecting fully the rights of private property invested under the authority of the charter is at least as great as in the case of that of a private corporation. By the repeal of the-charter of a bank, nothing is lost by the corporators but the franchise of the corporation. Provision can be made by which the liabilities of the corporation can be enforced, its debts collected, and the share of each stockholder in the capital stock and undivided profits fully protected and refunded. In case of the repeal of the-charter of a village, a college, or a church, the difficulty of refunding or distributing the corporate property to the beneficiaries according to their respective interests therein, may be very considerable ; but, in either of these three cases, the corporate property can. be protected and managed through the ^intervention of trustees appointed from time to time, so as to accomplish the object-of the association, without the convenience or aid of the corporate franchise.
It is said that the village corporation is connected with the administration of the public affairs, and therefore subject to control and regulation by the legislative power. But we should riot be induced by mere names or technical phrases to overlook the substance *561 and. reason of the thing. Is not ah incorporated bank, which is created by the authority of law, and endowed with an attribute of sovereignty, by which it is enabled to create the circulating medium of the country, and to control the standard of value, an institution connected with the internal government, or the administration of the public affairs? With what show of reality can it be claimed that a railroad corporation, endowed with extensive powers, and authorized to take and appropriate private property for public use, upon the ground that its purposes are subservient to the public welfare, is a mere private institution, disconnected with the affairs of the government? A college has for its object the advancement of the cause of education, and a church the cause of religion—both objects of public interest, and both recognized in the constitution-of the state as objects deserving the encouragement and favor of the government, from the fact of their being auxiliary to the successful administration of the public affairs. With what accuracy or propriety can either a college or a church, when instituted under the public authority of an act of incorporation, and having for its object these public interests important to the purposes of government, be denominated or treated as a mere private institution ?
It is said that in private corporations property is invested by persons for private or individual purposes. But this is not certainly more peculiarly the case in a college or a church corporation, than it is in a village corporation. Private property is frequently acquired by the latter by voluntary subscription and donation, as well as by the former, and the private and individual interests in the property of the ^village corporation is more immediate and direct than in that of the college or church corporation.
It is apparent, from a thorough examination of the subject, that the distinction between public and private corporations, as ordinarily recognized in the books, is a mere arbitrary distinction, without foundation in the nature, objects, incidents, or property of this class of institutions. And in truth there exists no sound and well-founded reason for treating the charters of those corporations usually called private corporations as contracts, while the charters of those known as public corporations are not so considered; or for denominating the former as mere private institutions, and the latter as public institutions; and the paramount considerations of the public interests or general welfare would certainly require that the *562 former should be subject to regulation by the law-making power ■as well as the latter.
The question under consideration is not one of expediency, but ■of constitutional legislative power. The frequent and inconsi derate ■exercise of' this power is not proposed. The existence of the right ■of the legislature to regulate or repeal the charter of a corporation is one thing, and the indiscreet exercise or abuse of that power another, and very different thing. A proposition for the exercise of this power involves the question, not of a contract, but of good faith on the part of the state in the administration of the public affairs ; and it should never be exercised, in relation either to public or private corporations, except upon plain and high considerations of ■ justice and public policy. When a law has been enacted conferring the civil rights of a corporate franchise on an association of individuals, who have, on the inducement thus held out by the government, embarked in any particular business and made extensive investments in property, the right of amending or repealing the law should be exercised with great caution, and a just regard for the private interests involved; and the public faith can only be preserved in the exercise of this power by some such paramount considerations *of the public interests and general welfare as justify and call for the exercise of the right of eminent domain. When persons engage in business, or make investments in property under the authority, and with the rights, privileges and advantages conferred by any of the laws or public institutions of the state, they do so, relying for their protection not upon the absurd fiction of a private contract between themselves and the state, but upon the high and sacred obligations of the public faith in the administration •of the government.
There are numerous relations arising from the laws and institutions of the state, creating obligations bearing fully as strong a resemblance to a contract, as the charter of a pifivate corporation,' which it is conceded do not fall within the scope and operation of the restrictive clause of the constitution of the U nited States in relation to contracts. Marriage is, in one sense, a contract, often involving in its incidents extensive rights to property and important ■obligations for the support of the wife, and the protection, maintenance', and education of children ; yet since the origin of our government, not only this contract, but also the rights and obligations incidental to it, have been subject to legislative control and regula *563 tion in almost every state of the Union. The marriage relation, although it is said to have its foundation in nature, and to be sanctioned by Divine Revelation, yet, in a legal point of view, it is one of the civil institutions of the state, deriving ail its legal efficacy and authority from the laws of the state, and therefore not within ,the operation of this restrictive clause of the constitution of the United States. It is true, however, that Judge Story, in intimating a different opinion in the case of Dartmouth College v. Woodward, remarks, that it is only in case of a violation of the marriage ■contract by one of the parties that the legislature has assumed the authority to grant a divorce. This is not strictly correct. But the advocates of this doctrine of vested rights, including Judge Story, deny the legislative authority to ^modify or repeal the charters of private corporations, either in case of the violation or abuse of the corporate franchise, or otherwise; claiming that the question of the violation or abuse of a corporate franchise is a judicial question, and not within the province of the legislature.
A law locating the seat of justice of a newly organized county at a particular village, on a jxroposition of the citizens of the village, in case of such location to raise means by private contributions to construct the public buildings for the county, is in the nature of a contract. Yet it can not be denied but that after the citizens of the village have complied on their part at great expense to themselves, and also made large investments in property at enhanced prices in view of the advantage of such location of the county-seat, the legislature may, from considerations of the public interests, remove by law such county-seat to some other place, or repeal the law creating the county, and thus not only divest the citizens of the village of the advantages of the county-seat, but also strip the county officers of the emoluments, special privileges, and civil authority conferred by their respective offices. And such .legislative act would present a question not of contract but of the public faith.
A license granted under the authority of law for a stipulated sum of money, and for a specified period of time, to a traveling merchant, to exercise certain special and exclusive privileges forbidden to the community at large in the sale of goods, wares, and merchandise within the state, is a franchise, and possesses more clearly the elements of a contract than the franchise of a private corporation obtained without the payment of a bonus; yet the authority *564 of the legislature to repeal the law and revoke the license can not be questioned.
. A license to keep a tavern or house of public entertainment, or to retail spirituous liquors; a license to keep a ferry; and a license to exercise the duties or business of an auctioneer ; each and all of these, and many others of a similar character, are special and ex-elusive rights and privileges *granted under the authority of law for stipulated sums of money and for specified periods of time. They are franchises, and partake much of the nature of contracts. A franchise is nothing more than a liberty to exercise certain special and exclusive privileges withheld from the community at large. 1 W. Blackstone, 37. Tet the constitutional authority of the legislature to regulate and control these licenses or franchises, with a view to the overruling considerations of the public welfare is unquestionable. A law' granting a pension to a person in consideration of public services, is in the nature of a grant or contract, but it is undeniable that such j>ension may be changed, suspended,, or abolished by the amendment or repeal of the law.
A public office conferring, as it usually does, a special privilege, and the civil authority to exercise a public employment and a right to the emoluments or profits belonging thereto, bears a close analogy to a franchise, and presents the elements of a contract more strongly than the charter of a corporation. Tet an officer who has abandoned his business and changed his residence to the injury of hiS’ private interests, to perform the duties of his public employment, for the faithful discharge of which during his term of office he is bound in a bond with sureties under a heavy penalty, may be divested of his rights, privileges, and emoluments, by a repeal of the' law creating the office. It is true, that Judge Hitchcock, in delivering the opinion of the court in the case of The State v. McCollister, 11 Ohio, 49, says, that the incumbent of an office “has a vested right in his office ” from which he can not be “ ousted by direct legislation.” Ido not understand the learned judge to mean anything more than that the incumbent has an existing legal right in the-office, from which the legislature has no power to dismiss him .by any direct act, or to divest him by a law prospectively adding new qualifications for the office. If anything more than this was intended or expressed, it is clearly not law; for it is well settled in this country that the incumbent may be deprived of an office by itsabolishment or repeal. The *State v. Dews, Charleton, 397; *565 Butler v. The State of Pennsylvania, 10 How. 402; The Commonwealth v. Bacon, 6 Serg. & R. 322; The Commonwealth v. Mann, 5 Watts & S. 418; Barker v. The City of Pittsburg, 4 Penn. St. 51; The Commonwealth v. Clarke, 7 Watts & S. 127; Conner v. The City of New York, 2 Sandford, 355.
The legislature of this state, by a single law, passed March 6, 1845, entitled, “An act to amend an act entitled an act to abolish the board of canal commissioners and revive the board of public works, etc.,” divested several hundred public officers, engineers, collectors of tolls, and other public agents, of their public employment before the expiration of their term of service. And the same legislature, on the 12th March, 1845, by an act entitled, “ An act to provide for the state printing,” repealed the office of state printer, and thus deprived the public printer of the state of the rights, privileges, and profits of his public employment in the midst of his term, notwithstanding he was under bond with security in the penal sum ■of ten thousand dollars for the faithful discharge of his duties, and had made necessary investments in printing materials, etc., to the amount of some thirty or forty thousand dollars for the execution •of the public printing during his term. And a bill in chancery filed in the supreme court of the state, by the public printer thus deprived of his situation, to enjoin the secretary, auditor, and treasurer of state from the violation of his contract, by the execution of this law, was, upon full hearing upon the merits, dismissed by the court, and the exercise of this power by the legislature fully sustained. See Records S. C. Franklin county.
When the rights and special privileges of persons, arising under such engagements with the state, presenting in a much stronger light the essential elements of a contract than is to be found in the charter of a private corporation, are thus subject to regulation and repeal by the law-making power of the state, it would seem that it was time that the doctrine of vested rights in regard to corporations in Ohio, at least, should be dropped and allowed to pass into oblivion.
*The term “ contract,” in the constitution of the United States, must, as Chief Justice Marshall says, be understood in its ordinary and limited signification, and not as extending to the rights and engagements created by or arising from the laws and civil institutions of the state. The charter of a private corporation does not, in truth and in reality, comprise the essential elements of a contract in its ordinary sense when applied to property, or some *566 object of value. These essential elements of a contract are the following, to wit:-1." The assent or agreement of two competent parties. 2. A legal and competent object or subject-matter. 3. A mutual legal consideration. 4. And a mutuality of obligation. In the absence of either one of these essential requisites, there is no contract. Are they to be found in the charter of a corporation?
1. It is claimed that the parties to the contract consist of the government on the one part, and the corporation or the individual corporators on the other. The advocates of this doctrine differ somewhat among themselves, whether the artificial person or the individual corporators, constitute the latter party. Mr. Justice Story, in the case of Dartmouth College v. Woodward, argues at great length to show that it,is the corporation which is the party to the contract. He ¡daces the doctrine, however, on either alternative, leaving its advocates to select either, as may best suit their views. Mr. Justice Washington, in his opinion in the same case,, and Chancellor Kent, in his Commentaries, place it upon the ground of a contract between the government and the individual corporators. But Judge Hitchcock, in the case of The State of Ohio v. The Com. Bank of Cincinnati, 7 Ohio, 128, says, “ that it is well settled” to be a contract “between the state and the corporation;” and he refers to the decision in the Dartmouth College case to sustain him !
It may be a matter of some importance to settle this question as to the real party to the contract, if there be one. The individual corpoi’ators, whether taken collectively or severally, are changeable; and those who are the corporators *one year may not be the next. And the grant of a franchise, which is said to be the consideration on the part of the government, is not made to the individual corporators, but to the artificial person ; and in one class of eleemosynary corporations, especially, the corporators are not even the beneficiaries of the grant. And again, where ho bonus is. paid by the corporators, the only consideration claimed to be received by the government is from the corporation, and not the individual corporators. On the other hand,, if it be insisted that the corporation is the true party, the question is not without difficulty. At the time of the grant of the franchise, and the acceptance and. organization under the charter, which is said to constitute the assent or agreement of the two parties, the artificial person is a nonentity—is without existence or the power of entering' into a. *567 contract. The charter is said to be-an executed contract; and how can the artificial being, which is said to be created by, or to arise from, the execution of the contract, be one of the original parties in its formation ?
Again, it is said that the legislature acts as the agent of the state in making this contract. An agent, in order to make a contract for the principal, must be empowered with competent authority so to do. It is well settled that the legislature can exercise no-powers except such as are expressly granted, and their necessary incidents. Legislative authority is, in very general terms, vested in the general assembly, which may by law authorize and direct the making of contracts ; but the making of a contract on the part of the state, as well as the execution of it, belongs peculiarly to the executive, and not to the legislative branch of the government. It is very clear that the authority of making contracts is not among the express powers of the general assembly; and I apprehend it would be difficult to show it to be necessarily incidental to any of them.
2. The object or subject-matter of the contract, according to this doctrine of vested rights, is the corporate franchise, which consists of the civil power and authority granted by the ^government creating the body corporate, and clothing it with certain civil rights, powers, and privileges withheld from the community at large. [See opinions of Mr. Justice Story and Mr. Justice Washington, in Dartmouth College v. Woodward, 4 Wheat.; Ang. & A. on Corp. 68.] A franchise in England is defined to be a royal privilege, or a bi’anch of the royal prerogative subsisting in the hands of a person by a grant from the crown. [2 W. Bl. 37 ; 4 Cruise’s Dig. 564.] There are various kinds of franchises; and, according to Blackstone, “It is likewise a franchise for a number of persons to be incorporated and subsist as a body politic, with a power to maintain perpetual succession, and to do other corporate acts.” According to this, a corporate franchise is a branch of the prerogative of government, or, in other words, a special grant of a portion of the civil authority of government in the hands of certain persons.
And the question here presented is whether the civil authority or power of the government, granted or conferred in any manner, can be made the legitimate subject-matter of a contract. I entertain the opinion clearly that it can not, within the true intent and meaning of the restrictive clause of the constitution of the United States.
*568 In this county no vested right of private property can exist or be held in the civil power or authority of government. Our constitution declares that the sole object of government is to secure to the people the blessings of liberty and promote their common welfare. Our government being one of delegated powers, founded upon the principle that sovereignty is inherent in the people; that civil power and authority is expressly delegated to the government only for the public good ; and that all power and authority not expressly delegated remains with the people ; it follows that the civil power delegated to the government is a high and sacred trust, to bo exercised solely for the equal protection and common benefit of the people. No portion of it can be sold out by the government, or parted with by contract. When, in the establishment of the civil institutions of the *state, or in the administration of the government, civil power and authority is vested or delegated to any person or persons, it is still a trust, to be exercised pursuant to the ■design of its original delegation by the people, and over subject to control and regulation for that purpose. The claim, therefore, that vested rights of private property can be created and held in the civil authority, or special privileges granted or conferred by the .government, is in derogation of the fundamental principles of all civil government in this country.
In England, franchises, offices and dignities or degrees of nobility, .are held to be incorporeal hereditaments, in which a man may ■have a property or estate. 1 W. Bl. ch. 12; 2 lb. 37. According to Blackstone, a man may have an estate in a public office, either to himself and his heirs, or for life, or for a term of years, or during pleasure only. Ib. vol. 2, page 36. So also with dignities and franchises. But the theory and foundation of the British government is essentially different from ours. The sovereignty there is said to be in the king instead of the people; and the king, whoso power in one sense is unlimited, and whose dignity is supreme, is the original source of all civil power and authority. He is said to be the fountain of justice and the source of all titles of nobility, offices and privileges. 1 Bl. 271. Ho can create and confer at pleasure franchises, offices and dignities for a term of years, for life, or ns estates of inheritance. 1 Bl. Com. 252 and 353; also Bacon’s Abr. title prerogative, and Appendix, same title, D.. It is in the exercise of these high powers that the king, by his letters patent, creates corporations. The king, as the original source ov proprietor of honor, *569 •office and privilege, may grant or confer franchises, offices and titles of nobility in such manner as to create vested rights of property in them. This, however, is upon the principle that government is instituted for the benefit of the rulers rather than the-governed.
But no such power or authority is vested in our government. The legislature can grant no franchise, office or privilege as the original source or proprietor of civil power and ^authority. It may, however, within the scope of its delegated power, create -offices and confer franchises and privileges as trusts to be used for the public good; but if, from such delegation of civil authority, -individual and private advantage result, it is not in the nature of a ■ vested right of private property.
It would seem that some of the courts and judges in this country have held franchises, offices, and privileges to be private property .and the subject-matter of private contracts, upon the authority of the laws of England, without taking into consideration the great and fundamental distinction between the source and the. object of all civil authority in that country and in this. Mr. Justice Story, in his opinion in Dartmouth College v. Woodward, 4 Wheat. 699, .says: “ The truth is that all incorporeal hereditaments, whether they be immunities, dignities, offices, or franchises, or other rights, are deemed valuable in law. The owners have a legal estate and property in them, and legal remedies to support and recover them, in case of any injury, obstruction, or disseizin of them. Whenever they are the subjects of a contract or grant, they are just as much within the reach of the constitution as any other grant.” ' The learned judge treats civil “immunities, dignities, offices, and franchises” in this country as “incorporeal hereditaments”—that is, property capable of inheritance!
The bill of rights in the constitution of Ohio, under which the law in controversy was enacted, contained the following restriction : “ That no hereditary emoluments, privileges, or honors shall ever be granted or conferred by this state.” It would be difficult to conceive how offices, franchises, and immunities could be conferred as incorporeal hereditaments or privileges, or estates capable of being hereditary, without a conflict with this constitutional provision.
The language of Judge Story is somewhat vague, and not expressive of any very definite conception of what constitutes property. Every right “deemed valuable in law,” and “to support *570 and recover which a legal remedy is afforded,” is not property. A , trust, public or private, may be deemed «valuable and be-protected by legal process, yet the trustee not hold any proprietary interest in it. A right to exercise the employment of a public office and receive the emoluments may be valuable to the incumbent, and may be asserted and maintained by him in a court of' justice; yet it is well settled that it is not property. The right of property consists in the absolute dominion over a thing, in the use, enjoyment, and disposal of it, without any control or diminution, save only by the laws of the land. 1 Wend. Black. 138. According to a standard elementary author, “ Property consists of those things which belong to us by that exclusive right which enables us to exclude all others from having anything at all to do with them ;” and in defining property, the author adds: 11 Property, considered as an exclusive right to things, contains not only a right to dispose of them, either by exchanging them for other things, or by giving' them away to any other person without any valuable consideration in return, or even of throwing them away, which is usually called relinquishing them.” Rutherforth’s Inst. 20; Puffendorf’s Laws-of Stature, 220. Franchises, offices, and immunities, therefore, are-not and can not be made property in this country, in the correct legal sense of that term. They are mere trusts of civil authority, derived from, or branches of that civil power which belongs to the people in their sovereign capacity, and which was delegated by them to be used through the agency of government solely and alone for the public good. This civil power, therefore, which belongs to the people at large as a community, and which in its exercise must always be subservient to the public welfare as its paramount and controlling purpose, can not be abridged or parted with by private contract, can not be made the legitimate object or subject-matter of private property, can not be used for mere private- and individual advantage, and no vested right of private property in it can be granted by the legislative power without a violation of its public trust.
*1 am aware that the supreme court of the United States-have, in several instances, and especially in the case of West River Bridge v. Dix, 6 How. 507, assumed the position that the franchise of a private corporation is private property. But, with great deference for the opinion of that court, I apprehend that this has-been adopted as “law taken for granted,” without investigation- *571 In the ease cited the question was not even discussed, but taken for granted both by the court and by the counsel. This opinion that the franchise of a corporation is private property appears to have had its origin in the doctrine prevailing in England, and which is not applicable in this country, and to be founded on the authority of the Dartmouth College case, which, on examination, does not-sustain it. And the reason assigned for this position in the opinion of the court in the case of West River Bridge v. Dix is that “it is its character of property only which imparts to it value, and alone authorizes in individuals a right of action for invasions or disturbances of its enjoyment.” This does not furnish a satisfactory test that a franchise is private property. It is not every right which is valuable, and for an invasion or disturbance of which, in its-enjoyment, a right of action is authorized, that constitutes private property. The right of a public or municipal corporation in its franchise may be valuable, and for an encroachment upon which a right of action is authorized; yet this is admitted not to be private property. The right to a public office maybe valuable; for any disturbance in the enjoyment of which a right of action is authorized. The right of suffrage may be valuable—is held dear by all freemen—and for a disturbance in the exercise of which a right of action exists; yet it is not a matter of private property. These are political rights, important, valuable, and capable of being asserted in a court of justice; yet they are clearly distinguished from the rights of private property. The rights of personal liberty and personal security are distinguished from the rights of private property; yet they arc valuable, and may be maintained by legal process as even *more sacred than the latter. The rights of private property, as well as the rights of personal liberty and personal security, are original and fundamental rights, existing anterior to and independent of civil government; but the franchise of a corporation is an adventitious or derivative right, originating in the government—a trust of civil power granted or delegated in the administration of the public affairs; and, although private or individual interests may result from it, and private property be invested in business under its authority, and with the advantage of’ its privileges; yet the political right, the franchise itself, must remain subservient to the paramount object of its creation—the original object of all delegated civil power-—the public welfare. And, although this right may be valuable, and may be asserted in a *572 court of justice, it can not be made tbe subject of private property until the theory and fundamental principles of our government are changed, until the people part with their sovereignty, and civil power, cut loose from its subserviency to the public good, becomes .arbitrary. When it shall be established that government is instituted for the benefit of rulers rather than the people, then civil power may be made the subject of barter and sale, and vested estates of inheritance, or for life, or for years, in the special privileges of civil authority, be created for mere private and individual advantage, as appears to be the case in England. But, even in England, where it is said that franchises, offices, and dignities or ■degrees of nobility are the subjects of private property, in which hereditary estates, or estates for life or for years are created, and may exist, these rights are not placed above or made independent of the paramount object of all civil government by the fiction and inviolate sanctity of a contract, but are liable to be made subservient to the public welfare by the legislative control of parliament.
3. Without a sufficient legal consideration, there is no contract. What, even in the semblance of a consideration, was received by the state from the Bank of Toledo for its charter ? The investments made by the stockholders in the stock *of the corporation were not for the benefit of the state, but their own individual and private interests. The only pretense of a consideration set up is that an advantage or benefit to the public results from the business of the corporation. About this, a difference of opinion might exist. But, be that as it may, this can be nothing more than that incidental or consequential benefit likely to accrue to the community at large from the successful prosecution of any of the useful branches of industry. The corporation, although a political institution, created by public authority, from considerations of public policy, is devoted to its own peculiar business and interests, and does not engage or obligate itself, in any manner, to serve the public or the state, as a consideration for its charter. No damage or loss is sustained, or act done, or to be done, on the part of the company, or even a pepper-corn rendered, with a view to a consideration or compensation for the charter. Angelí & Ames, in their Elementary Treatise on the Law of Private Corporations, say (page 28) : “ In all the last named and other like corporations, the acts done by them are done with a view to their own interest; and if thereby they incidentally promote that of the public, it can not reasonably *573 be supposed they do it from any spirit of liberality they have beyond that of their fellow-citizens.
4. Without a mutual and binding obligation, there can be no contract. Wherein consists the binding obligation on the part of the company? The corporators are under no obligation to accept the-charter, and exercise its functions after it is granted. This is a-mere voluntary matter upon their part. And if they do accept the charter, and organize under it, they are under no binding obligation to continue the corporation or business during the term of the charter; but they are at liberty to dissolve the corporation and discontinue the business at pleasure. Where, then, is the obligation on the part of the company ? It can not consist in the observance of its duty as a corporation. The action of the body corporate is limited by the extent of its corporate powers. This is-*not a matter of obligation, but of power, inasmuch as it is well settled that a corporation can do no legal and valid act beyond the scope of its corporate authority.
The charter of a corporation in this country is a legislative enactment, possessing the form and essential parts of a law, but not those of a contract; and, in Ohio, it is published, distributed, and judicially noticed as a public statute. The enactment of laws belongs peculiarly to the legislative, but the making and execution of contracts to the executive department of the state. There is no better settled rule of law than that, where one of the parties to a contract has violated the terms and conditions of it, the other party may rescind or disregard it. And it would seem that to revoke. or rescind a franchise, by the repeal of a charter, on the-ground of its violation or abuse, would be at least as appropriately a legislative act as that of entering into or making a contract.
But if the charter of a corporation, which possesses all the forms- and essential parts of a law, be a contract, such contract is contained in the provisions of a law, and must, as such contract, embrace the inherent incidents of the law, and thus, by its own terms, be subject to modification and repeal by the legislature. This legislative power includes as well the power to amend or repeal laws-as the power to enact them. The one is the necessary incident of the other. This fundamental principle is given to us by very high authority, in the following language :
“ The legislative power implies a power not only of making laws, but of altering and repealing them. As the circumstances, either- *574 •of the state itself, or of the several individuals which compose it, are changed, such claims and such duties as might once be beneficial, may become useless, burdensome, or even hurtful. If, therefore, the legislative power could not change the rules which it proscribes, so as to suit them to the circumstances of the body politic, and of the members of that body, it could not answer the purposes for which it was established, and could not, at all times, settle their claims and their duties, in such a manner as.is most conducive to the good of the whole, and of the several individuals which make up that whole.” Rutherford’s Inst. 270.
*When, therefore, the legislature enacts a law, the right to amend or repeal it, is implied in its terms as one of the incidents of it, and inherent in the power which created it. This is admitted as a general principle, but it is claimed that there is an exception to it, in the case of a law creating a private corporation, that, in such case, the legislature part with the right of amendment or repeal, unless it be reserved by express provision. The ground of this exception is not easy of comprehension. It is not to be found in any express provision of the constitution, and it is difficult at least to perceive how it can be derived by implication, either from the constitution or the law itself.
The doctrine that the right of amendment or repeal is thus parted with by mere implication, is reversing the well settled prin-ciplo that public grants are to be strictly construed, and nothing derivod from them by implication. And in the case of The Providence Bank v. Billings, 4 Pet. 514, it is very clearly settled, that any rights or privileges, which may exempt a corporation from the ordinary burdens or liabilities common in laws applicable to individuals, do not flow necessarily from the charter, but must be clearly expressed in it, or they do not exist. The right of amendment and repeal being a highly important fundamental right, inherent in the legislative power itself, the great interests of the community are concerned in preserving it undiminished; and if it could be surrendered or diminished in any instance whatever, it must be by ..express provision; and the community has a right to insist that the abandonment of such a right is not to be taken from mere implication and presumption, where the deliberate purpose or intention on 'the part of the state to make such surrender or abandonment -does not expressly and positively appear.
The legislative authority of the state, which is the most import *575 ant prerogative of sovereign authority conferred by the people on the government, is, in general terms, vested in the general assembly. This high civil authority, which includes the power of legislative control over all existing laws, by *amendment or repeal, is not subject to surrender or diminution, but must remain the same in the general assembly at each session. Every law must be subject to the implied condition of this legislative control. This is the great safeguard in the hands of the people, to prevent the legislative power from becoming absolute and tyrannical. If the legislature could, in the enactment of laws at one session, by contract or otherwise, abridge the legislative authority at a subsequent session, and thus provide against either the repeal or améndment of its enactments in future, this power would soon become absolute and dangerous. The constitution, which is the fundamental law of the state, made by the people themselves in their sovereign capacity, is alone beyond legislative control. If the legislature could enact laws, and, by contract, part with the legislative control over them, they would have all the permanency of the constitution itself. The claim that the general assembly can, in the absence of any constitutional provision authorizing it, part with any legislative power, or by contract limit or restrain the future exercise of this high civil function, is, to say the least, grossly absurd. In every view of the subject, therefore, there can exist no real necessity for any express reservation, in the enactment of any law, of the right of modification or repeal, which, out of abundant caution, has been .sometimes made in the charters of private corporations.
If, therefore, a law creating a corporation be a contract, it must, in its nature, and by its own terms, be subject to modification or repeal, at the discretion of the legislature. The amendment or repeal of the charter of a corporation (if it be contract), not being in violation of its terms, therefore, could not be said to impair or invalidate the obligations of such contract.
But the whole doctrine that the charter of a private corporation is a contract is founded on a fiction, at variance with the truth or real fact existing. An ordinary act of incorporation contains nothing more than the usual stipulations and provisions to be found in laws generally. Persons asking for the passage of a law incorporating a company do *not in fact'think of such a thing as a negotiation for entering into a contract with the state. And the members of the legislature, in the enactment of such laws, never *576 imagine that they are negotiating and settling the terms and conditions of a contract on behalf of the state; and much less, that they are, by contract, surrendering or parting with a portion of the legislative power of regulation and repeal. In every point of view, therefore, the idea that the charter of a corporation is a contract, whereby this legislative power of regulation and repeal is bargained away, or disposed of by contract, is a legal fiction in opposition to the truth of the fact, and the obvious intention of the persons interested. Courts should not thus treat those high trusts of civil authority, and by legal intendments and mere technical reasoning take away from the state any portion of that power over its own internal police and government which may be highly important to* its own well-being and prosperity.
It is claimed, however, that this doctrine—that the charter of a private corporation is a contract, has been settled by authority which places it beyond the reach of controversy at this late day. I admit that much authority can be produced on this subject. Rut a close examination of its true effect, and the grounds upon which it rests, has reminded me of some stringent but practical remarks’ of Lord Denman, C. J., in delivering judgment in the House of Lords, in the recent case of O’Connel v. Regina, involving some important legal and constitutional doctrines, in the course of which he took occasion to remark : “ That a large portion of that legal opinion, which has passed current for law, falls within the description oí‘law taken for granted;’ and that when, in the pursuit of truth, we are bound to investigate the grounds of the law, it is plain, and has often been proven by recent experience, that the mere statement and re-statement of a doctrine—the mere repetition of the catalena of lawyers—can not make it law.”
I have already remarked that this whole doctrine of vested rights-of private property in the franchises of corjiorations *is founded on the decision of the supreme court of the United States-in the case of The Trustees of Dartmouth College v. Woodward, 4 Wheat. 518. And all the other adjudications, both by the state, as-well as the national courts, and the opinions of elementary authors, in which this doctrine has been recognized, have been based upon the decision of this ease. If, therefore, the doctrine be not clearly and satisfactorily established by this case-, it is not well sustained by authority. True it is¡ that several decisions of the supreme court of the United States, made prior to that of the Dartmouth *577 College case, have been referred to in support of this doctrine, but on examination they will be found to bear no analogy whatever in principle. Those cases are as follows : Fletcher v. Peck, 6 Cranch, 87, was a case where the legislature of Georgia passed an act divesting a beneficial estate in lands granted and conveyed by deed to a number of individuals in pursuance of a law of the state authorizing it. The case of The State of New Jersey v. Wilson, 7 Cranch, 43, related to an interest in lands secured by an express-contract contained in a public treaty of cession with the Indians, whereby the privilege of exemption from taxation was said to be indelibly impressed upon the lands, and could not, as was held, be taken away without a violation of the public faith solemnly pledged to the people of another nation. Terret v. Taylor, 9 Cranch, 43,. was the case of an attempt, under a law of Yirginia, to divest an interest in lands conveyed by deed, and vested under the authority of law. In all these cases, the laws held to be void affected contracts in the ordinary signification of the term, and relating to-rights of private property of a permanent and unquestionable-character.
What, then, is true effect of the case of The Trustees of Dartmouth College v. Woodward, as judicial authority, upon the question under consideration ? This was an action of trover, instituted in the State of New Hampshire by the trustees of Dartmouth College against William H. Woodward, for the alleged wrongful conversion of *the books, records, and other corporate property, to which the plaintiffs claimed to be entitled. It was not, therefore, for any infringement or invasion of a corporate franchise, but for an, alleged injury to the plaintiffs in their right to certain goods and chattels to which they claimed to be entitled, that the suit was brought. The defendant sought to justify h'imself by certain laws-enacted by the legislature of New Hampshire, remodeling and reorganizing Dartmouth College, which in substance and effect created a new corporation, by the name of the trustees of Dartmouth University, to be sxibject to the direction and government of the state authorities, and which required all the property and effects of the trustees of Dartmouth College to be transferred to the new corporation. There was a special verdict of a jury in the superior court of New Hampshire, finding the facts of the case, upon which that court rendered judgment in favor of the defendant.
It appears in the case that about the year 1734 the Rev. Eleazer *578 “Wheelock, an eminent philanthropist, established, at his own expense and on his own estate, a charity school for the education, and instruction of Indians in the Christian religion. His success in this pious work induced him to solicit contributions for carrying on and enlarging his undertaking, and extending it to the education of English youth and any others. He accordingly obtained large contributions of money from benevolent persons in England, and extensive donations of land from persons in New Hampshire. And, as the founder of the college, he duly appointed sundry persons trustees of the institution, who accepted the trust. And this appointment he confirmed by a provision in his last will and testament. Subsequently, he made application to Ring George the Third for a charter, for the incorporation of the institution, requesting that the persons named by him in his last will as trustees should be made members of the proposed corporation. The charter was accordingly in due form granted in the year 1769, naming Eleazer Wheelock as the founder of the college and appointing him president ^thereof, also appointing tho trustees, making them tho members of the corporation, fixing their number permanently at twelve, and authorizing them to appoint and displace professors and other officer's of the institution,- and to supply any vacancy which might occur in their own body. In this form the institution was continued till 1816, when the legislature of New Hampshire passed the law, the constitutionality of which was contested in this proceeding.
The bare statement of the case is sufficient to show that this case can not be directly in point upon the question whether the franchise of a corporation conferred by a law duly enacted by legislative authority in this country is a contract within the operation of the constitution of the United States. And the state laws drawn into the controversy in the case did not simply interfere with the -charter, but transferred the private property held by the trustees to another corporation, in violation of the terms of the contract by which the trust had been created and the property invested. Here was a contract, in the ordinary signification of the- term, by which private property to a large amount had been invested in a particular manner, and for a special object, and which was impaired or .materially changed by these state enactments.
Chief Justice Marshall delivered the opinion of the court in the case, placing it upon the only ground upon which, as it would appear, a *579 majority of the court concurred in the decision. Mr. Justice Story and Mr. Justice Washington each delivered his opinion in the ease at great length, placing it exclusively upon the ground that the charter of a private corporation was a contract within the meaning of the constitution. But the Chief Justice does not place the decision of the caso upon that ground ; and in no part of the opinion does he use any expression which in any manner conveys the idea that the charter granted by the Crown was in and of itself a contract. On the contrary, the opinion is placed distinctly and clearly upon the ground, not that the charter, but that “ the circumstances of the case ” disclosed the existence of a contract, the terms of which were impaired by the ^legislative enactments in question. The chief justice, after narrating the particular circumstances of the case at some length, on page 627, says:
“ It can require no argument to prove that the circumstances of this case constitute a contract. An application is made to the •crown for a charter to incorporate a religious and literary institution. In the application it is stated that large contributions have been made for that object, which will be conferred on the corporation as soon as it shall be created. The charter is granted, and on its faith the property is conveyed. Surely in this transaction every ingredient of a complete and legitimate contract is to be found.”
Large contributions of property had been made for the objects of the institution, which, on the faith of the charter, were conveyed and invested. Here, undoubtedly, was a contract in its ordinary meaning—a contract between the contributors of the property and the corporators by which a trust was created, and the property conveyed and invested. This was nothing more than the contract usually made by the donor, stockholder, or other contributor for the investment of private property under the authority of a charter. Whether it be in public or private corporations, the investments are always made on the faith of the continuance of the charter. The public faith is involved in matter by the circumstances. There is no contract here with the government. The contract is between the individual stockholders or contributors and the corporation or corporators; and the state becomes a party to the transaction, not in the capacity of one of the contracting parties, but in its sovereign capacity as the civil government of the country, instituted to protect the rights and advance the common wel *580 fare, and upon which is enjoined by the circumstances the duty of exercising good faith in granting and continuing the civil privileges conferred by the charter.
Again, on page 642, Chief Justice Marshall says:
“These gifts were made, not indeed to make a profit for the donors or their posterity, but for something in their opinion of inestimable value, for something which they deemed a full equivalent for the money with which it was purchased. The consideration for which they stipulated was the perpetual application of the fund to its object, in the mode prescribed by themselves.”
And on pages 643 and 644 he adds:
*“ This is plainly a contract to which the donors, the trustees, and the crown (to whose rights and obligations Now Hampshire succeeds) were the original parties. It is a contract made on a valuable consideration. It is a contract for the security and disposition of property. It is a contract on the faith of which real and personal estate has been conveyed to the corporation. It is then a contract within the letter of the constitution, and within its spirit also, unless the fact that the property is invested by the donors in trustees for the promotion of religion and education, for the benefit of persons who are perpetually changing, though the objects remain the same, shall create a particular exception, taking this case out of the prohibition contained in the constitution.”
Besides the donors and trustees, the crown is here named as one-of the original parties to the contract. But the meaning of the-learned chief justice is sufficiently apparent from the connection in which the expression is used. The crown was a party to the transaction out of which the contract arose, and which enjoined the duty of good faith on the government in the continuance of the charter. He denominates the contract “ a contract for the security and disposition of property,” by which he could have meant nothing else than the contract creating the trust and making the investment of the property. In no place does he speak of it as a contract for the grant of a corporate franchise. It was not pretended that any consideration was paid to the government. According to this opinion of the court, the subject-matter of the contract impaired was not the corporate franchise, but the conveyance and disposition of property for a special object, under the authority of the charter. Contracts are always made on the faith of the existing laws and civil regulations relating to their subject-matter. The laws of the *581 place where a contract is made, relating to its subject-matter, aro said to be embraced by implication in the terms of the contract. •So this contract for the creation of a trust and the investment of property embraced the terms of the charter, and was made on the faith of it. And nothing more than good faith in the administration of the public affairs in relation to the charter could have been implied on the part of the government; for the right of the legislative power in England to repeal this charter at any time was unquestionable, and by implication embraced in the terms of the charter itself.
-•'There can be no reason for doubt as to the true ground upon which this decision rests. In the concluding part of the opinion, when speaking in reference to the manner in which the contract was impaired by the legislative enactment, Chief Justice Marshall says, on pages 652 and 653:
“The management and application of the funds of this eleemosynary Institution, which were placed by the donors in the hands of trustees named in the charter, and empowered to perpetuate themselves, are placed by this act under the control of the government of the state. The will of the state is substituted for the will of the donors in every essential operation of the college. This is not an immaterial change. The founder of the college contracted, not merely for the perpetual application of the funds which they gave, to the objects for which those funds were given; they contracted also to secure that application by the constitution of the corporation.”
“ In the view which has been taken of this interesting case, the ■court has confined itself to the rights possessed by the trustees, as ..the assignees and representatives of the donors and founders for the benefit of religion and literature. Yet it is not clear that the trustees ought to be considered as destitute of such beneficial interests in themselves as the law may respect,” etc.
In every instance in which Chief Justice Marshall, in this opinion, ■alludes to the contract, which he says “ the circumstances of the case ■constitute," he expressly refers to the contract for the investment and perpetual application of the property for the purposes of the trust. And, in concluding, he says that the court has confined itself, in the view taken of the ease, to the rights possessed by the trustees as the assignees and representatives of the donors and founders of the institution, etc. It was not, therefore, the rights *582 of the corporation to the civil privileges of the corporate franchise which were taken into consideration in the decision, but the rights of the donors and founders held by their assignees or representatives, and these rights were such only as were secured by the contract creating the trust, and making the appropriation of the property. The contract taken into consideration was a contract for the investment of property under the charter, and not the franchise itself. In no instance in the course of the decision does Chief Justice-.Marshall attempt to show, or even use the expression, that the charter of a corporation is of itself a contract, or that the- civil ^privileges of a corporate franchise constitute the legitimate subject-matter of a contract. On the contrary, the contract which he shows to have been violated by the legislative act in question, was a contract in the ordinary signification of the term, relating to the investment of private property and the creation of a trust.
It appears from the report of the case that Mr. Justice Johnson concurred in the decision for the reason stated by the chief justice that Mr. Justice Livingston concurred for the reasons stated by the chief justice, and also those stated by Justices Story and Washington ; but Mr. Justice Duvall dissented from the decision; Mr. Justice-Tod being absent during the term on account of ill-health. So that Justices Story and Washington had the concurrence only of Mr. Justice Livingston, in placing the case upon the ground that the charter granted by the crown of England to the trustees of Dartmouth College was a contract within the operation of the constitution of the United States. And the chief justice and Mr. Justice Johnson having placed the decision distinctly upon a different ground, and Mr. Justice Duvall having dissented from the decision, it does not appear in the report of the case that the position of Justices Story and Washington had the concurrence of more than one-half of the court. Justices Story and Washington doubtless concurred in reasons stated by the-chief justice, but they went a step further, and assumed the additional ground that the charter of the corporation in and of itself was a contract, the terms of which were infringed by the legislative act in question; and in this it does not appear that they had the concurrence of more than Mr. Justice Livingston. So that upon the question whether the franchise of the corporation was a contract or not, the court must have been equally divided.
There appears to have been a zealous anxiety on the part of a *583 portion of the court to establish the doctrine that the charter of a private corporation was a contract within the operation of the constitution of the United States. And, ^strange as it may appear, it is nevertheless true, that the syllabus of this case announces the leading principle settled in the case to be that the charter granted by the British crown to the trustees of the Dartmouth College was a contract within the meaning of the restraining clause of the constitution of the United States above recited—a doctrine which does not appear to have had the concurrence of more than half of the court!
On the supposition that this charter of Ring George the Third was a contract, how could its terms have been violated by the legislative enactments remodeling and-amending it? The right of parliament at the time it was granted, and at any time prior to the revolution to amend or repeal it, was admitted by all. The existing right of amendment and repeal by the law-making power was one of the conditions or regulations under which the charter was granted, and, therefore, of course, by implication embraced in its terms. It has been settled that, by the revolution which separated this country from the British empire, all the powers of the British government over existing institutions devolved on the states. So that the legislature of New Hampshire became clothed with all the legislative powers of parliament over this corporation. It can not be claimed that any new conditions were added to the terms of the charter by the change effected by the revolution. The right of amendment and repeal being, therefore, inherent in the terms of the. charter from the time of its original grant, even admitting it to have been a contract, the legislative acts of New Hampshire could not have impaired its obligations, or violated its terms as such contract, so far as the franchise itself was concerned. This is most clearly sustained by the doctrine laid down by the supreme court of the United States in the case of the West River Bridge Company v. Dix et al., 6 How. 532, 533, in which case, Mr. Justice Daniel, in delivering the opinion of the court, says :
“ The impairing of contracts inhibited by the constitution can scarcely, by the greatest violence of construction, be made applicable to the enforcement of the terms or necessary import of a contract ; the language and meaning of the inhibition were designed to embrace the proceedings attempting the interpolation of some new term or condition foreign to the original agreement, and, *584 therefore, inconsistent with it and violative thereof. . . . But into all contracts, whether made between states and individuals or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself; they are superinduced by the pre-existing and higher authority of the laws of- nature, of nations, or of the community to which the parties belong; they are always presumed to be known and recognized by all, are binding upon all, and need never, therefore, be carried into express stipulation ; for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, whenever a necessity for their exercise shall occur.”
The charter of Dartmouth College being, therefore, by its own inherent terms, subject to legislative control, this decision can be maintained solely and alone on the ground that the state laws in .question interfered with and impaired the contract for the investment of the property under the authority of the charter, by a change which transferred this property to another corporation, and •altered the purposes, the mode, and the authority for its management and application. If the decision be not sustainable on this ground, it is not law.
Such, then, upon full and fair examination, is the effect of the decision of the supreme court of the United States in the Dartmouth ■College case. And it is perfectly clear that it does not satisfactorily ■establish or sustain the doctrine that the civil rights and privileges conferred by the franchise of a private corporation constitute a contract, or the legitimate subject-matter of a contract. This doctrine, however, which is sustained by the syllabus of the case, but not by cither the opinion of the majority of the court or by sound reason and good sense, has been recognized as established law by numerous subsequent decisions, both by the supreme court of the United States and by the courts of many of the states of the Union. These subsequent decisions being cases in which this doctrino was not fully examined, but .resting on the Dartmouth College case as authority to sustain them, must fall within that class of current legal opinion which is denominated by Lord Denman “ law taken for granted.” And it would not seem necessary to occupy time and space here by special reference to them.
*The case, however, of The State of Ohio v. The Commercial Bank of Cincinnati, 7 Ohio, 125, having been designed to *585 establish this doctrine as the settled law of Ohio, is entitled to more particular notice. This was a suit instituted in behalf of the state •against the bank, to recover the tax assessed under a law of the •state passed March 12,1831, entitled “An act to tax bank, insurance, and bridge companies,” imposing a tax of five per cent, on the dividends of all such companies. The bank was incorporated in 1829, and the sixth section of the charter contained the following provision : “ That the State of Ohio shall be entitled to receive four per cent, on all dividends made by said bank.” The law of 1831, by a general provision, fixed the tax upon all banks in the state at five per cent, on their dividends. The increase of one per cent, was the tribute claimed by the state from this bank under the circumstances. And this it refused to pay, to recover which the suit was brought. There was no clause in the charter of this bank expressly limiting the power of taxation, or in any manner expressly exempting it from any other or different rate of taxation. The majority of the couit, however, Mr. Justice Collett dissenting, decided the cause in favor of the bank, upon the authority of the doctrine supposed to be established by the decision in the Dartmouth College case. Mr. Justice Hitchcock, in delivering the opinion of the court, says (page 128):
“We take it to be well settled that the charter of a private corporation is in the nature of a contract between the state and the corporation. Sad there ever been any doubts upon this subject, those doubts must have been removed by the decision of the supreme court of the United States in the case of Woodward v. Dartmouth College (4 Wheat. 516). Powers once granted can not be revoked,” etc.
Superficial, indeed, must have been the examination given, in this instance, to the authority relied on, and upon the weight of which .a most important cause was decided. The inaccuracy in the effect given to the authority referred to is characteristic of the ease with which the doctrine of the mere syllabus of the case has been adopted as “law taken for granted.” The authority cited wholly fails to sustain this ^decision, nothwithstanding the learned judge says, with such confidence, “ that it must have removed all doubts, had there ever been any doubts on this subject.”
The reasoning in this opinion of Judge Hitchcock is as unsatisfactory as the reference relied on to sustain him. He admits that :a corporation may be taxed with as much propriety as a natural *586 person, and that an act of incorporation, silent on the subject of' taxation, does not exempt the body corporate from the exercise of the taxing power, and the decision of this case stands on the ground that the clause of the charter above recited is a material stipulation in a contract, and to show the existence of the contract, the learned judge reasons as follows (pages 128, 129):
“ The general assembly propose to confer upon such persons a»' shall become stockholders in the bank, certain powers and privileges. They propose to confer upon them all the privileges of banking. But as these privileges arc valuable to the recipients, it seems to be but right and proper that a suitable return should be made for the benefit received. Therefore, the legislature imposed upon the corporators, in their corporate capacity, the condition that they shall pay to the state four per cent, on their dividends, and they reserve to themselves no right to change these terms. The only consideration to be paid is this four per cent. In other words,, the general assembly say to such persons as may take the stock, you may enjoy the privilege of banking, if you will consent to pay to the State of Ohio for this privilege four per cent, on your dividends, as they shall from time to time be made. The charter is-accepted, the stock is subscribed, and the corporation pays or is willing to pay the consideration 'stipulated, to wit, the four per cent. Here is a contract, specific in its terms, easy to bo understood.”
This is the kind of a contract which it is claimed places the corporation beyond the control of the law-making power of the state. The benefits of the contract, however, are all on one' side. How is' the state a beneficiary in this contract? How is “that suitable return” made to the state, which, it is said, was ‘.‘but right and proper ” for these “ valuable privileges ?” The stipulated four per cent, as the “ suitable return,” turns out to be a mere limitation upon the taxing power of the state, a most important stipulation in favor of the bank. Without this stipulation, it is admitted, the state' might tax the bank not only this four per cent., but any other rate of taxation above *that amount, which might be found expedient and proper. This “ suitable return ” or beneficial consideration to the state in the supposed contract, was, therefore, according to this very decision under consideration, a mere restraint upon the j)Ower of taxation, which prevented the state, according to this decision, from imposing upon this bank an amount of tax equal to *587 that which was imposed upon the other banks of the state. Verily,, the citizens of the state should be grateful for this valuable consideration, rendered by the bank as a “ suitable return ” for its valuable privileges!
Again, to sustain this decision I find the following reasoning on page 131:
“ Another view may be taken of the case, which goes to strengthen the positions already assumed. This bank, by its charter, is bound to pay into the state treasury four per cent, on its dividends as they are made. Suppose the legislature reduce the tax upon banks to two or three per cent., or suppose they should entirely repeal the laws taxing banks, etc., still the Commercial Bank would be bound to pay the four per cent. Its charter would remain the same, and its liability would not be altered. If, then, a repeal of the laws taxing banks would not operate to the advantage of this institution, certainly a general law increasing the tax ought not to operate to its injury.”
To what weight is a decision entitled, supported by such reasoning ? This was truly giving stability to the charter of a corporation ! If the legislature could not lessen the tax on this bank, it certainly could not increase it. But is a single remark necessary to show the fallacy of such reasoning ? Had a general law been passed exempting all the banks in the state from taxation, is it likely that this bank would have generously come forward and paid its four per cent, tax upon the patriotic claim that the state had not the power to relinquish or discharge, either in whole or in part, the claim for taxes assessed against ? This, however, is as accurate as the broad, unqualified declaration, “Powers once granted can not be revoked!”
The supreme court of the United States have greatly restricted and qualified the doctrine promulgated as law established by the decision in the Dartmouth College case. It is no longer held by this tribunal that the right of property in a corporation is more sacred than the same *right could possibly be in the person of a citizen; “an opinion, which,” in the language of Mr. Justice Daniel, “must be without any grounds to rest upon, until it can be demonstrated either that the ideal creature is more than a person, or the corporeal being is less.” See West River Bridge Company v. Dix, 6 How. 533. It was settled in the cases of The Charles River Bridge v. Warren Bridge, and Providence Bank v. Billings, that *588 public grants are to be strictly construed; that corporations can claim no privileges or exemptions by implication or presumption; that any privileges which may exempt corporations from the burdens common to individuals do not flow necessarily from their charters, but must be conferred by express provision, or they do not exist. And in the latter case it is settled that the taxing power, being of vital importance and essential to the very existence of the government itself, even if it could be limited or bargained away by contract, such relinquishment can not be derived from implication or pjsssumption, and that in the absence of an express provision, clearly declarative of the deliberate purpose of the state to make such relinquishment, no such exemption can be set up. This doctrine of the supreme court of the United States is in direct conflict with the decision in the case of The State v. The Commercial Bank, Above mentioned. There was no provision in the charter of this bank expressly limiting the power of taxation, yet the court in this decision find such limitation by implication and presumption. The doctrine of the court in the case of the Commercial Bank, if it were law, would enable corporations to derive privileges and immunities from mere implication and presumption tending to control, or at least to restrict the power and duty of government in its high function of advancing-and protecting the general good.
In the case of The Charles River Bridge Company v. Warren Bridge Company, 11 Pet. 420, it appeared that in 1650 the legislature of the then colony of Massachusetts granted to the corporation of Harvard College the liberty and authority to dispose of a ferry passing over Charles river, between ^Boston and Charlestown, the revenue arising from which ferry had been by previous acts given to the college. And in 1785, the legislature of the State of Massachusetts, without the consent of the college, incorporated the proprietors of the Charles River Bridge, with the authority to build and continue a toll-bridge over Charles, river, in tbe place where the ferry was then kept, subject, among other liabilities, to the payment of an annuity of two hundred pounds to Harvard College. The bridge was built, and the privileges of the company somewhat modified by subsequent acts. But during the continuance of the franchise of this corporation, in 1828, the legislature incorporated the proprietors of Warren Bridge, with authority to build a bridge over the same fiver, between Boston and Charles-town, within a few hundred feet of the other bridge, and which *589 was in a short time to become a free bridge; by means of which, the franchise of the other corporation was rendered wholly valueless. This was done without any provision for compensation to the proprietors of Charles Eiver Bridge for the injury to their franchise; and the constitutionality of the act was sustained on full investigation, both by the supreme court of Massachusetts and the supreme court of the United States, upon the grounds substantially of the paramount considerations of the public interests, and the fact that the charter of the Charles Eiver Bridge Company contained no express provision inhibiting the erection of the other bridge.
In the case of Phalen v. The Commonwealth of Yirginia, 8 How. 163, it appeared that, in 1829, the legislature, of Yirginia granted to-the Fauquier and Alexandria Turnpike Eoad Company the benefit of the privilege of raising $30,000, by way of lotteries, through the agency of five commissioners appointed for that purpose, for the improvement and repair of the road of the company. And, in 1834, the legislature passed an act for the suppression of lotteries, under severe penalties, which limited and abridged the privilege previously granted to the turnpike corporation ; and the question whether the grant of this valuable right or franchise to the company *was a contract within the protection of the constitution of the United States was carried to the supreme court of the United States, where it was adjudged that, among others, the-ground of public policy, and the duty of the state to suppress nuisances injurious to the public morals; justified the law of 1834, even if it did invade the sanctity of a corporate franchise.
In the case of Armington et al. v. Barnet et al., 15 Ver. 745, it-was held by the supreme court of Yermont, that an act of the legislature, authorizing the easement or franchise of a turnpike corporation, to be taken and subjected to the purposes of a free public highway, provision being made for compensation to the corporation, was constitutional on the ground that the public good required it. The same principle was settled by the supreme court of New Hampshire, in the case of Barber et al. v. Andover, 8 N. H. 398.
In the case of the Turnpike Company v. Railroad Company, 10 Grill & Johns, 392, it was held by the supreme court of Maryland, that where a corporation, under a charter duly authorizing it, had constructed a turnpike road, and was in the full enjoyment of its-corporate privilege, that the construction of a railroad, by a corn *590 pany under a subsequent charter between the same termini, and upon the same line of travel, which rendered the franchise and the road of this turnpike company of but little value, was not an unconstitutional or wrongful act, which would sustain an action of trespass.
In the case of The Enfield Toll-Bridge Company v. The Hartford and New Haven Railroad Company, 17 Conn. 455, it was held, by the supreme court of Connecticut, that where an incorporated bridge company had constructed a toll-bridge across the Connecticut river, from Enfield to Suffield, in whose charter it was expressly provided that no person or persons should have liberty to erect another bridge any where between the north line of Enfield and the south line of Windsor, the right of a railroad company, subsequently incorporated, to construct a bridge across the Connecticut river, between the north line of Enfield and the south line of *Windsor, on the line of its railroad, and which would divert a part of the travel from the toll bridge, was constitutional, a compensation being made or tendered to the bridge corporation for the damage.
In the case of The Boston Water-Power Company v. The Boston and Worcester Railroad Corporation, 23 Pick. 361, where a corporation, under the authority of its charter, had constructed a dam ■over an arm of the sea, near Boston, and also certain basins, raceways, etc., and erected mills in connection therewith, with full authority to use the lands in the basins, derived partly from the state and partly from individuals, and also to use, sell, or lease the water power thus created, it was adjudged by the supreme court of Massachusetts, that an act of the legislature incorporating a railroad company and authorizing the construction of a railroad across these basins, causing obstruction and injury to the water power, etc., and providing for a compensation to be made for the diminution and injury to the water power, but providing no compensation for the injury to the franchise of the corporation, was constitutional and valid.
In the case of Brown v. The Penobscot Bank, 8 Mass. 445, the supreme court of Massachusetts held that a law passed in 1809, imposing upon the corporate privileges of the banks of that state the ■condition of the payment of two per cent, per month, by each bank, on the amount of its bills, the payment of which should be by such ■■bank refused, was not in conflict with any provision in the consti *591 tution, either of the United States or of the State of Massachusetts.
I might continue this reference to cases to an almost infinite ex tent, in which the constitutionality of laws have been sustained, which encroached upon and impaired, to some extent, the franchises and privileges of private corporations. But I shall conclude these references by the case of The West River Bridge Company v. Dix et al., 6 How. 507, in which the supreme court of the United States settled the principle that the franchise, as well as the property of a private corporation, might be taken under the .authority of a Estate law, and made subservient to the pub-lie welfare, in the exercise of the right of eminent domain. This is a very important qualification of the doctrine of the inviolability of the charters of private corporations. It appears to be now settled by authority that, in the exercise of the right of eminent domain, the franchise of a corporation owning a ferry must give way to a law establishing a toll bridge; that the franchise of a corporation owning a toll bridge may, by law, be subjected to the public use, by the establishment of a free bridge; and that the franchise of a turnpike corporation may be, by law, subjected to the purposes either of a free road or of a railroad.
The doctrine of the right of eminent domain is extensively reviewed by Chancellor Walworth, in the case of Beekman v. The Saratoga and Schnectady Railroad Company, 3 Paige, 45, in which it was decided that this prerogative of sovereign authority could be exercised by the legislative power, not only where the safety, but also where the interest and even the convenience of the state is concerned; and that, in exercise of this high function of the government, the right of private property and many other rights must yield and become subservient to the public welfare. It is well settled that the exercise of the right of eminent domain rests with the legislature, which alone has the authority to determine when the public use shall require the assumption of private property, and to regulate the mode of compensation. 2 Kent. Com. 340.
This principle, therefore, settled by the supreme court of the United States, places corporate franchises under the control of the legislative authority, whenever either the public safety, the public interest, or even the public convenience shall demand it. The exercise of the legislative right of amendment or repeal stands upon, fully as high ground as this. Those who oppose the doctrine of *592 inviolate vested rights in corporate franchises have never claimed' the exercise of the right of the legislative power to amend or repeal charters, except whore the public safety or public interest *absolutely demand it, and then only in such manner as-would do no violence or injustice to any rights of private property which might be affected thereby.
The restrictive clause in the constitution of the United States inhibiting the enactment of any law by state authority impairing the obligations .of a contract, contains no qualification, and does not except the case of the exercise of the right of eminent domain, or any other instance of public emergency. And the constitution of the United States contains no provision authorizing or prescribing the mode for the exercise of the right of eminent domain by state authority, or requiring compensation to be made where private property is taken for public use by state authority. It has been settled that the provision in the fifth article in the amendments to the constitution of the United States, declaring that private property shall not be taken for public use without just corn-compensation, is a limitation on the exorcise of power by the general government, and is not applicable to legislation by the states. Barron v. The Mayor and Council of Baltimore, 7 Pet. 243. The-constitution does not prohibit a state from impairing the obligations of a contract, unless compensation be made ; but the inhibition is absolute. So that all acts coming within the prohibition are unconstitutional. If the charter of a corporation, therefore, be a contract, upon what ground can it be subjected to the public use, in the exercise of the right of eminent domain, without a conflict with the constitutional restriction for the protection of contracts ? It is-said that the lex loci enters into the terms of all contracts, and annexes to them conditions not arising out of the literal terms of the contracts themselves, but superinduced by the pre-existing and higher authority of the laws of the community to which the parties belong, with a knowledge of which, and with reference to the binding obligations of which, they must be presumed to act. Upon this principle it is said that all contracts are made and rights acquired in subordination to the paramount power and duty of the state to protect and promote the public good; and that this liability-*to be made subservient to the public welfare, although tacit and implied, is a condition inherent in all contracts and acquired rights, and of paramount and controlling operation. Upon this ground *593 it is said that the right of eminent domain is exercised without impairing the obligations of contracts, and in conformity to an essential' and inseparable condition, whenever the public safety, public interest, or public convenience may require it. The right to the exercise of this high function depends upon the demand or requirement of the public interest; and this must be determined by the legislative power, which includes as well the control over existing laws by amendment or repeal, as the power of eminent domain.
The legislative power is the most important attribute of government. It is delegated with a view to protect and advance the public welfare, and can be legitimately exercised only when the public safety, the public interest, or public convenience may require it. The legislative power includes both the exercise of the right of eminent domain, and the right of control over existing laws, by amendment or repeal, as incidents or means of executing its high functions. To protect and advance the public welfare is as well the object of the right of amendment or repeal as that of the right of eminent domain. Both these important powers rest upon the same ground, both are exercised for the accomplishment of the same general object, the advancement of the public welfare, and both are included as means or instruments within the control of the legislative authority. It is said that the right of eminent domain is essential to the accomplishment of the great object of government, and can not be parted with or abridged. Equally so is the right of legislative control over existing laws. These are both high prerogatives of sovereign authority, essential for the protection and advancement of the public welfare, and neither can be parted with or abridged by contract or otherwise, without an alteration of the fundamental law of the state. As all contracts and vested rights of property are held subject to the tacit and implied condition, of a liability of being subjected to the public use by the right of eminent domain, *so all laws, whether acts of incorporation in the nature of contracts or not, must also be in the same manner subject to the implied liability of amendment or repeal by the legislative power. The rights of private property, as well as the derivative rights resulting from the civil institutions of the state, must all yield to the paramount and overruling consideration of the public interest. And if the franchise of a corporation may be made subservient to the public welfare by the right of eminent domain, it would be strange, indeed, if the same thing could not be also done *594 id the exercise of the right of amendment and repeal. In either «ase the legislature have the power to render compensation, or provide the mode for doing it, should justice to the rights of any person concerned require it. In the exercise of either power, the paramount and controlling object is the public interest; and it is this which calls for and justifies in all cases the exercise of civil authority. If, therefore, the public safety or public interest shall require either the amendment or the repeal of the charter of a private corporation, the paramount object of the legislative authority must prevail; and should justice require it, compensation can be made for any private damage which may be sustained; but if the coi’poration shall have forfeited its charter by the abuse of its franchise, there is no object of value taken away for which compensation could be made. It is said that compensation for the property taken is essential to the exercise of the right of eminent domain. But where a corporate franchise has been forfeited by abuse, and the public safety requires its repeal, it would scarcely be claimed that the legislative power could be restrained by the consideration that there was no object of value for which condensation could in justice be made. It is said that to find the forfeiture of a franchise is a judicial act. In some cases this may require the searching investigation of a court of justice. But the right of .amending and repealing laws is a legislative act, which no constitutional restraint requires to be delayed or to give way for & judicial •act. The legislative power often makes the investigation, and finds the facts which constitute *the basis for its action; and where the abuse of a corporate franchise is notorious and palpable, there can be no reason or good sense in requiring a ten years’ litigation in going through the forms, delays, vexations, and expenses of a suit against a corporation, to ascertain what no one in the world would deny, and which the legislature can act upon as an undeniable matter of public notoriety.
The decisions relied on to sustain the position that the charter ■of a corporation is a contract, relate to corporate franchises derived either from private statutes, or grants of charters from the crown •of England. It has never been adjudged by any court, on deliberate investigation, that a public statute or general law, under the authority of which corporations, or associations in the nature of «orporations, were formed, was a contract, and consequently not subject to amendment or repeal by the legislative power of the *595 ■state. Mr. Webster, as counsel for the plaintiffs in the Dartmouth case, (4 Wheat. 580, 581) urged that the statutes of New Hampshire in question, being private statutes affecting only particular persons and their peculiar privileges, were not “laws of the land’’ within the meaning of the constitution of that state; and to sustain his position he relied on the distinction of Blaekstone and Coke, that a law is “ not an order from a superior, to, or concerning a particular person, but something permanent, uniform and universal;” and that a particular act of the legislature,, not having relation to the •community at large, was rather a sentence or decree than a law. 1 Bl. Com. 44; Co. Lit, 46. In England private statutes, and the king’s grants, although always subject to legislative control, partake much of the nature of contracts. Blaekstone, treating of private statutes (2 W. Bl. 345) says, “ a law thus made, though it binds all parties to the bill, is yet looked upon rather as a private conveyance, than as the solemn act of the legislature. It is not, therefore, allowed to be a public, but a mere private statute; it is not printed or published among the other laws of the session; it hath been relieved against, when ^obtained upon fraudulent suggestions; it hath been h olden to be void, if contrary to law and reason; and no judge or jury is bound to take notice of it, unless the same be specially set forth and pleaded.” We learn from Chancellor Kent (see 1 Kent’s Com. 506), “ that there is a material distinction between public and private statutes, and that the books abound with eases explaining this distinction in its application to particular statutes.” Public statutes relate to the community at large, and are binding upon all persons and interests, where applicable. Statutes generally are public acts; a private statute is said to be an exception to the general rule. It operates only upon a particular thing or private persons, and is said not to bind or conclude strangers to its provisions.
Whatever ground may have existed for holding the elements of a contract to exist in the terms of a private statute, which withdrew it from legislative control, such a doctrine would be wholly inapplicable to public and general laws, which, having relation to the whole community and being binding upon all, must be controlled by the legislative power with a view to the general good, and can not be made subservient to mere individual or privato interests.
The law under which the Bank of Toledo claims its authority as a body corporate is a public statute, of general operation, and pub *596 lished and distributed with the general laws of the state. True it is entitled “ an act to incorporate the. State Bank of Ohio and other-banking companies.” But its title is not expressive of its true character. It creates no state bank, or bank in which the state is in any manner interested as a stockholder; neither does it incorporate any specified company or persons in the usual form of a special act of incorporation. It names or designates no particular-person or persons upon whom it confers corporate rights. It fixes the general terms, conditions and regulations, under which companies throughout the state are authorized to organize. It contains not only the general regulations for the government of the-business of banking in the state, but also provisions general in their nature, in relation *to revenue for general purposes, and penal enactments, which would have been -appropriate provisions in the criminal laws of the state. It is not a special act of incorporation—not a private or local statute ; but a public and general statute in its character, its provisions and its operations, and so-treated by the legislature, and so recognized by all the departments of the state. It will scarcely be claimed on behalf of the plaintiff that this law was enacted merely to promote and protect the private interests of those who might engage in business under it. Its object was to establish a system of public policy, which must be-presumed, at least, to bo intended to advance the public welfare. It contains neither the form nor the substance of a contract. "Where a private statute is enacted, making a special grant to a particular individual or set of individuals designated, there may be-found, by construction, the semblance of a contract. But here is a general law fixing the terms and regulations of a general system, under which a particular kind of business may be carried on by such persons as may see proper to form companies, and can bring-themselves within its requirements.
The essential elements of a contract are not to be found either in the law, taken entire, or in any particular provision of it. No obligation is imposed on any person to engage in business under its-regulations. Those who form associations and engage in banking-under the system, do it solely from considerations of their own personal and private interests. The state does not in any manner engage or employ them. They pay the state no bonus or compensation for their privileges ; and they are at liberty to discontinue the-business whenever they may determine that their private interests. *597 require it. If any supposed advantages result incidentally to the public, it does not arise from any obligation imposed on the bankers, ■and is, therefore, only that consequential benefit which may accrue to the public from the business authorized by law in any of the other pursuits of the people. General laws may be enacted, conferring special advantages to encourage particular productions in ■^agricultural, mechanical, and other pursuits; a tariff may be established for the special advantage and protection of domestic manufactures; and yet, however the obligations of good faith on the part of the government may be involved in the matter, no one will claim any such law to constitute a contract.
If the charter of a company formed under this banking law con.stitutes a contract within the operation of the prohibitory clause of the constitution of the United States, there must exist a mutuality of ■obligation having relation to a right to something which can be asserted in a court of justice. According to Chief Justice Marshall’s opinion in the Dartmouth College case, this is the only kind of a contract to which this constitutional provision was designed to apply. If such a charter be this kind of contract, the specific performance of it could be enforced by a bill in equity, or the breach of it would lay the foundation for an action for damages. This is .a test of the existence of a contract. Suppose a bank should refuse to perform its duty in accordance with the terms of the charter, ■could the state sustain a bill in equity to compel a specific execution of the contract on the part of the bank ? "What kind of a decree ■could the state take against the bank under such a proceeding ? Again, suppose a breach of the terms of the charter by the bank, could the state sustain an action against the bank for a breach of a contract? "What form of action would lie? "What would be the measure of the damages, or the ground for the assessment ? A writ of quo warranto might be brought for a forfeiture of the franchise, a proceeding not applicable to contracts; or a mandamus might lie to compel, not the performance of a contract, but the performance of some duty enjoined by law. But a bill in equity to compel the specific execution of the terms of the charter as a contract or a suit for damages for a breach of the charter as such contract, would be a novel proceeding. Such a thing has never been attempted, and never would be sustained. The bank may be under some legal liability or obligation to conform its ^action to the terms of the law in the execution of its powers. But this does not constitute a *598 contract, and the state conld assert no right in a court of justice to-damages or redress for a breach of any such duty.
This law contains no provision inhibiting the right of amendment or repeal, and, by its inhei'ent terms, would be subject to legislative control as much as any other general law on the statute book. If the charter of a banking company under the law be d contract, such contract must embrace the terms of the law and be comprehended, in fact, within its provisions ; and, therefore, by its own terms, subject to legislative control. It is said that a contract, to be obligatory, need not contain an express provision that the parties to it shall not violate its conditions. This is true, but not applicable. Here the law, which, by its very nature and constitution, is subject to amendment or repeal by the legislative power, constitutes and embodies the terms of the contract, if one exist at. all. The contract, therefore, must, by its own inherent terms, be subject to this legislative control, unless the law contains an express inhibition creating an exemption from this liability. So important an immunity could not be derived from implication or presumption, in the absence of an express provision conferring it. The doctrine that the privileges and exemptions not common to-individuals can not be acquired by corporations in the absence of express provisions conferring them, is applicable here, and too well settled to require repetition. It is, therefore, the rational presumption that if the legislature, which enacted this law, had intended to-withdraw it from the control of future legislatures, if it had tho power so to do, such an intention would have been manifested by" an express inhibition of the right of amendment or repeal.
In England, where franchises, offices and dignities are said to be the subjects of private property, in which estates of inheritance and estates for life and for years are created, these privileges and immunities are still subject to the incidental and implied condition of legislative control by parliament.
*The constitution of the state under which this banking-law was enacted contains the following in article eighth :
“ Sec. 27. That every association of persons, when regularly formed within this state, and having given themselves a name, may, on application to the legislature, be entitled to receive letters of incorporation, to enable them to hold estates real and personal, for the support of their schools, academies, colleges, universities, and for other purposes.”
*599 The constitution, by this provision, expressly authorized the granting of acts of incorporation, and prescribed the mode of doing it. Three things were required as preliminary steps to authorize it to be done. 1. An association of persons regularly formed.. 2. A company name; and 3. An application to the legislature. These requirements of the constitution were conditions precedent to the exercise of the authority. It is true that the legislative-power of the state is conferred on the general assembly in general terms; and it is said that the legislative power includes the authority to grant acts of incorporation. It is a settled rule of construction, however, that where any power is conferred, and a specific mode prescribed for its exercise, it can be exercised in no other manner than that provided. And all powers not expressly conferred are reserved by the people.
This general law, therefore, does not incorporate companies in the mode prescribed by the constitution, which, as it would, appear, had in view the granting of special acts of incorporation to companies previously formed. In this constitutional mode provided, an organized company would have existed, with which the state authorities could have communicated in fixing the terms of the charter, and upon which the corporate privileges could have been conferred understandingly. Rut not so with this banking law. No company was already formed, which, “ on application,” was “ entitled to receive letters of incorporation.” This law simply prescribed the terms and mode for forming companies in future, and the privileges which they might exercise. The banking companies, therefore, existing under this law are not corporations constituted in strict conformity to the constitution of the state, and as such entitled to the common law ^incidents of corporations. It is not claimed, however, that these companies are illegal; and I would not say that associations or collective bodies of men may not be legally constituted under the provisions of a general law, and receive from it the right to transact business, and to sue and be sued in their company name, to have perpetual succession, and indeed, many of the attributes of corporations. The joint stock banks in England, called into existence by the act of 7 Geo. IV, have been considered quasi corporations of this description. Harrison v. Timmins, 4 M. & S. 510 ; Ang. & A. on Corp. 22, 49. These companies being the mere creatures of the statute, however, can *600 at most be entitled to no rights or privileges beyond those strictly conferred by the statute.
In the interpretation of a statute, the several acts in pari materia are to bo taken and compi'ised together in the construction of them, for the reason that they must be considered as having one object in view, and as acting upon one system. Mr. Smith, in his Commentaries on Statutory and Constitutional Construction, 750, 752, says:
“ The whole system of legislation upon the subject may be taken into consideration, in order to aid in the construction of a statute relating to the same subject-matter; hence, other statutes in pari materia, whether they be repealed or unrepealed, may be considered.” Church v. Crocker, 3 Mass. 21. It is. equally well settled that every act of incorporation is subject to the provisions of all general laws relating to matters about which the charter is silent.
At the time of the enactment of this banking law, which was the 24th February, 1845, there existed a general statute entitled “ An act instituting proceedings against corporations not possessing banking powers, and the visatorial powers of courts, and to pDrovide for the regulation of corporations ■generally,” passed March 7, 1842, which contained the following provision :
“ Sec. 9. That the charter of every corporation of every descrip-tion, whether possessing banking powers or not, that shall hereafter be granted by the legislature, shall be subject to alteration, suspension, or repeal, in the discretion of the legislature.”
*As a matter of construction, it is perfectly clear that had the legislature intended to inhibit the right of amendment or repeal in relation to this banking law at the time of its enactment, ■either this provision in the general laws of the state would have been repealed, or an express provision inserted to create the exemption in regard to the banks which might be formed thereafter. And in the face of this glaring fact, the claim that this exemption can be derived by implication or presumption has no foundation in reason or common sense.
But independent of this matter of construction, which would seem to be incontrovertible, this bank law was, at the time of its enactment, subject to legislative control by this express provision in a general law of the state. It is true that this provision was repealed by the act of 12th of March, 1845, amendatory of the act relating to informations in the nature of quo warranto, etc. But *601 the repeal was prospective, and could not have a retroactive operation. And the effect of this provision, be it observed, was not that every corporation hereafter formed, but that “the charter of every -corporation that shall hereafter be granted by the legislature,” shall be subject to this legislative control. Now, the charters of ■these banking companies were granted at the time of the enactment of the banking law, and became subject to this provision in an existing general law of the state; and the subsequent repeal of the provision had relation to the charters of corporations which might thereafter be granted, and not to those which had been previously granted and became subject to its terms.
The view here taken upon the first proposition is decisive of the case. But there is another aspect of this case presented by the second proposition.
2. Does the 60th section of the bank law of 1845 relative to taxation contain a material stipulation in a contract not subject to change or modification by the law-making power of the state?
*It is claimed that this provision constitutes an essential part of the franchise of each bank existing under the authority •of the law. Now, if a corporate franchise be not a contract or the subject-matter of a contract, and as such exempt from amendment or repeal, it follows as a legitimate conclusion that this provision -does not contain the binding obligation of a contract withdrawing it from legislative control.
The subject of this provision is taxation, and the stipulation ■claimed to exist is that the prescribed mode and rate of taxation shall be observed as invariable during the entire period of the existence of each bank under the law. The question arises here, whether this provision of the law can, either in the nature of its ■subject matter or by its terms, bo a stipulation in a contract which, limits the legislative authority of the state in regard to the right •of taxation.
The power of taxation is one of the most important attributes •of sovereign authority inherent in government and essential to its ■existence. It is a high trust of civil power delegated for the common good, to be exercised even at the most critical periods and for the most important pui’poses, on the free exercise of which the interest certainly, and perhaps the liberty, of the whole community may depend. This prerogative of sovereignty, like the right of -eminent domain, and the right of legislative control over existing *602 laws by amendment and repeal, can not be impaired or arrested in its exercise in order to advance private or individual interests, but must remain at all times subservient to the great object and end of all civil government, the promotion of the happiness and welfare of the community. An attempt, therefore, on the part of the legislature to part with any portion of this power, or to restrain or-abridge the exercise of its functions by contract, would be a violation of the high trust by which it was delegated, an abuse of sovereign authority liable to lead to consequences dangerous to the very existence of the government itself.
Not Only is it an attribute inherent in the nature of the taxing jDOwer that its exercise must remain in unabridged subserviency to the public welfare, but it is an essential requisite *in this, trust of civil authority that its functions should be so exercised as. to apportion the burdens of the government as far as practicable, with equality and justice to all the members of the community; and a law imposing unequal burdens of taxation, oppressing some to favor others, is an abuse of sovereign power and a violation of that high trust by which the power of taxation is delegated. This function of civil authority, vitally essential to the existence of the government, requires great delicacy and a high sense of justice in its exercise; and the abuse of it has led to difficulties, which in their-consequences have subverted empires. It is important, therefore, that the true nature of the power of taxation, and the principle upon which it is delegated, should be maturely considered and well understood. A frequent recurrence to fundamental principles is. enjoined by our bill of rights. A reference, therefore, to standard authority, for the true nature and foundation of the power of taxation, is not inappropriate.
Puffendorf’s elementary work, chapter 9, of Book 7, contains the-following:
“ Since the subjects are obliged to the bearing of taxes and the like burdens on no other account but as they are necessary to defray the public expenses in war or peace, it is the duty of sovereigns, in this respect to draw no further sujiplies than either the mere necessity or the signal benefit and interest of the state shall require. And then they are to see that these impositions be levied according to the justest proportion; and that no immunities or exemptions be granted to certain persons, to the defrauding or oppressing of the rest.”
*603 And I find the following in Rutherforth’s Institutes of Natural Raw, 272, 273 :
“As it belongs to the legislative power of a civil society to direct the several members of it what they are to do for the common good, so it belongs to the same power to direct them likewise what they are to give for this purpose; that is, the power of raising money to answer the expenses which the society must make in its political capacity, or in pursuing the ends for which it was formed, is a branch of the legislative power.
“ This right of the legislative power over the property of the subjects is not a right to take the whole, or, indeed, any part of it from them causelessly and arbitrarily. The preservation of each man’s property is one of the ends which he proposed to himself in entering into civil society. But it is absurd to suppose that he would give up the whole of his property for the sake of preserving it. And the right which the society has, either over his person or over his property, is to be measured by what he may reasonably be presumed willing *to give up for the sake of obtaining those ends which he proposed to himself in becoming a member of such society. Upon this account the burden of those payments which are called taxes, or duties and customs upon goods both movable and immovable, ought to be proportioned, as near as may be, to the value of each person’s property; because the more a man’s property is worth, the more he is naturally willing to pay for the security of it.”
It is clearly an essential quality in the taxing power that its burdens be apportioned, as near as may be, to the value of each man’s property; and that no immunities or exceptions be granted, favoring certain persons and thereby defrauding or oppressing the rest. A contract on the part of the government, to exempt ono class of the community, either in whole or in part, from its just proportion of the burdens of taxation, would be repugnant to the true nature and essential character of this important civil power, an abuse of legislative authority, a violation of the fundamental principle, in regard to the public burdens, upon which alone persons become members of the community, and therefore of no binding obligation. It was said, by the supreme court of New Hampshire, in the case of Brewster v. Hough, 11 N. H. 138, that a law making such exemptions from taxation was valid until repealed. The enactment of a law may be a flagrant abuse of the legislative *604 power, and yet the law not absolutely void, but binding until repealed. But a contract to perpetuate this abuse of civil authority, by imposing a limitation on the legislative right of amendment or repeal, would clearly be void, and without any binding obligation. A law is void when it comes in conflict with some express constitutional provision, but a contract is void when illegal, or against public policy, or made without competent parties, or a competent subject-matter.
It is very true that, if we were governed by bare precedent without recurrence to first principles and the reason of the law, we might be led to a different conclusion. Eor, so far as bare precedent is concerned, it would appear to bo as well settled by the decisions of the supreme court of the United States, and also by the state courts, that the taxing power may be parted with or abridged • by contract, as the bright'of legislative control over acts of incorporation by amendment or repeal. They both rest upon the «ame ground; and, in either case, the claim is to limit or restrain, the high functions of civil authority by contract, in order to advance mere private and individual interests.
The right of taxation, like the right of eminent domain, and the right of amending and repealing existing laws, is a branch of the legislative authority. Each of these high functions of the legislative power constitutes a trust—a most important trust—of civil authority, essential to the well-being of the community. Neither of them can be bartered off by the legislature, either in whole or in part, or in any manner abridged or restrained in its exercise by •contract. But each, as an essential attribute of sovereignty, must remain in full and undiminished vigor, and be at all times subservient to the paramount object of all civil government—the safety and welfare of the people.
There is yet another aspect of this case, which is conclusive against the plaintiff:
On the supposition that the legislature is competent to perform the executive duty of making contracts, the question whether this particular provision constitutes a material stipulation in a contract, or a simple rule of action, prescribed by the law-making power, would be a matter of statutory construction. According to the well-settled rule of construction, public grants are to be strictly construed, and nothing to be derived from them by implication and presumption; and according to the doctrine of the supreme court *605 of the United States, in the ease of The Providence Bank v. Billings, the taxing power being vital and essential to the existence of the government, if it can be parted with to any extent by contract, will not be presumed or taken to.be surrendered or abridged in any degree, in the absence of clearly expressed and positive provision to that effect.
The clause in this provision of the law, claimed to be evidence of the fact of a contract stipulation, is in these words: *“ which sum or amount, so set off, shall be in lieu of all taxes to which such company, or other stockholders thereof, on account of stock owned therein, would otherwise be subject.”
At the time of the enactment of this banking law, there existed upon tbe statute book general laws imposing ta*xes upon banks and other corporations, to which the banks, under this law, would have-been otherwise subject, and from the operation of which, alone, upon a strict construction, this provision created an exemption, was the taxation authorized and existing, to which such company, or the stockholders thereof, would otherwise have been subject.
This provision constitutes a part of a statute, is clothed in the-language of a statute, is the proper subject-matter of a statute, and while it prescribes a rule of action, with a view to existing circumstances and laws, it is prospective in its operation, yet it contains no express provision or stipulation against such taxes as might thereafter be authorized and imposed; and no express inhibition against its subsequent amendment or repeal. Upon the application, therefore, of the rule of statutory construction, the surrender or abridgment either of the right of amendment or repeal, or of the power of taxation, is not to be taken by mere implication or presumption. In the case of Gordon v. Appeal Tax Court, 3 How. 133, and other cases, in which it has been held that the power of taxation might be surrendered or limited by legislation, there existed either a direct and express pledge of the public faith, or a direct, express, and unequivocal provision against the future or different exercise-of the right of taxation. The application of this rule of construction is fortified by the consideration of the striking inequality and injustice of the rule of taxation here prescribed, as well as the utter want of any equivalent, either rendered or promised, on the part of any bank, for the surrender or limitation of a power so valuable and essential to the public interests. The acquisition of such a power, and in such a manner, by the *banks, would im *606 ply bad faith and corruption on the part of the legislature, and a reckless disregard of the public interests; a conclusion which courts, in their judicial action, would not be justified in finding by mere implication, at least, in the absence of express proof. Besides this, the legislative interpretation given to this proposition by subsequent enactments, and especially by the very act of 1851 which is in controversy, is conclusive on this question of statutory construction.
In each of the views, therefore, presented by this case, whether a contract within the meaning of the constitution be sought for in the general powers, privileges, and immunities of the bank, or in either the nature of the subject-matter, or the special terms of this particular provision of the banking law, the plaintiff must fail in the action.
Judgment for the defendant.
Mr. Justice Thurman did not sit in this case.
Bannet, J.
The claim to exemption from taxation, made under the act of 1845, raises the only question presented in this case.
The same question was made in the case of Debolt v. The Ohio Life Insurance and Trust Company, decided at the present term. I have there stated my views upon it, and, for the reasons there .given, I freely concur in the judgment rendered in the case. Upon other questions alluded to in the opinion in this case, not necessarily involved in the inquiry, I prefer to wait until they have been fully discussed, and their decision shall become necessary, before ■expressing any opinion upon them.